Exhibit 2





**Entity Name: MAGIC LEAP, INC.**

**Jurisdiction:** CA

**Date:** 5/27/2016

**Receipt Method:** Process Server

**Case Number:** 16CV295461

**Plaintiff:** GARY BRADSKI AND ADRIAN KAEHLER

**Defendant:** MAGIC LEAP, INC., ET AL.

**Document Type:** Summons, Complaint & Attachment(s)/Exhibit(s)

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

ENDORSED
FILED

**MAY 23** 2016

David H. Yamasaki, Clerk of the Superior Court
County of Santa Clara, California
By_____
Deputy Clerk
Wengel

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Magic Leap, Inc. and Does 1-25

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Gary Bradski and Adrian Kaehler

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case. *¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California, County of Santa Clara
191 N. First Street, San Jose, CA 95113

CASE NUMBER:
*(Número del Caso):*
16CV295461

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jack Russo, Entrepreneur Law Group, 401 Florence Street, Palo Alto, CA 94301, (650) 327-9800

| DATE: May 23, 2016 | DAVID H. YAMASAKI | Clerk, by | , Deputy |
|---|---|---|---|
| *(Fecha)* | Chief Executive Officer, Clerk | *(Secretario)* | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* **Magic Leap, Inc.**

   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)          ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)

   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

COPY

ENDORSED
FILED PLD-C-001

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Jack Russo, Esq. (State Bar No. 96068)<br>Christopher Sargent, Esq. (State Bar No. 246285)<br>Entrepreneur Law Group<br>401 Florence Street, Palo Alto, CA 94301<br>TELEPHONE NO.: (650) 327-9800   FAX NO. *(Optional):* (650) 618-1863<br>E-MAIL ADDRESS *(Optional):* jrusso@computerlaw.com<br>ATTORNEY FOR *(Name):* Gary Bradski and Adrian Kaehler | MAY 23  2016<br>David H. Yamasaki, Clerk of the Superior Court<br>County of Santa Clara, California<br>By_____<br>Deputy Clerk<br>D. Monroe |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Santa Clara
STREET ADDRESS: 191 N. First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME: Downtown Superior Court

PLAINTIFF*: Gary Bradski and Adrian Kaehler

DEFENDANT*: Magic Leap, Inc.

[✓] DOES 1 TO 25 _____

CONTRACT
[✓] COMPLAINT    [ ] AMENDED COMPLAINT *(Number):*
[ ] CROSS-COMPLAINT    [ ] AMENDED CROSS-COMPLAINT *(Number):*

| Jurisdiction *(check all that apply):* | CASE NUMBER: |
|---|---|
| [ ] **ACTION IS A LIMITED CIVIL CASE**<br>Amount demanded [ ] does not exceed $10,000<br>[ ] exceeds $10,000 but does not exceed $25,000<br>[✓] **ACTION IS AN UNLIMITED CIVIL CASE** (exceeds $25,000)<br>[ ] ACTION IS RECLASSIFIED by this amended complaint or cross-complaint<br>[ ] from limited to unlimited<br>[ ] from unlimited to limited | 16CV295461 |

1. Plaintiff* *(name or names):*
   Gary Bradski and Adrian Kaehler
   alleges causes of action against defendant* *(name or names):*
   Magic Leap, Inc. and Does 1-25
2. This pleading, including attachments and exhibits, consists of the following number of pages: 44
3. a. Each plaintiff named above is a competent adult
      [ ] except plaintiff *(name):*
          (1) [ ] a corporation qualified to do business in California
          (2) [ ] an unincorporated entity *(describe):*
          (3) [ ] other *(specify):*

   b. [ ] Plaintiff *(name):*
      a. [ ] has complied with the fictitious business name laws and is doing business under the fictitious name *(specify):*
      b. [ ] has complied with all licensing requirements as a licensed *(specify):*
   c. [ ] Information about additional plaintiffs who are not competent adults is shown in Attachment 3c.
4. a. Each defendant named above is a natural person
      [✓] except defendant *(name):* Magic Leap, Inc.       [ ] except defendant *(name):*
          (1) [ ] a business organization, form unknown          (1) [ ] a business organization, form unknown
          (2) [✓] a corporation                                  (2) [ ] a corporation
          (3) [ ] an unincorporated entity *(describe):*         (3) [ ] an unincorporated entity *(describe):*
          (4) [ ] a public entity *(describe):*                  (4) [ ] a public entity *(describe):*
          (5) [ ] other *(specify):*                             (5) [ ] other *(specify):*

\* If this form is used as a cross-complaint, plaintiff means cross-complainant and defendant means cross-defendant.

**PLD-C-001**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Bradski et al. v Magic Leap, Inc. | |

4. *(Continued)*
   b. The true names of defendants sued as Does are unknown to plaintiff.
     (1) ☑ Doe defendants *(specify Doe numbers):* 1-15 _____ were the agents or employees of the named
        defendants and acted within the scope of that agency or employment.
     (2) ☐ Doe defendants *(specify Doe numbers):* 16-25 _____ are persons whose capacities are unknown to
        plaintiff.
   c. ☐ Information about additional defendants who are not natural persons is contained in Attachment 4c.
   d. ☐ Defendants who are joined under Code of Civil Procedure section 382 are *(names):*

5. ☐ Plaintiff is required to comply with a claims statute, **and**
   a. ☐ has complied with applicable claims statutes, *or*
   b. ☐ is excused from complying because *(specify):*

6. ☐ This action is subject to   ☐ Civil Code section 1812.10   ☐ Civil Code section 2984.4.

7. This court is the proper court because
   a. ☑ a defendant entered into the contract here.
   b. ☐ a defendant lived here when the contract was entered into.
   c. ☐ a defendant lives here now.
   d. ☑ the contract was to be performed here.
   e. ☐ a defendant is a corporation or unincorporated association and its principal place of business is here.
   f. ☐ real property that is the subject of this action is located here.
   g. ☐ other *(specify):*

8. The following causes of action are attached and the statements above apply to each *(each complaint must have one or more causes of action attached):*
   ☐ Breach of Contract
   ☐ Common Counts
   ☑ Other *(specify):*
     Declaratory Relief

9. ☑ Other allegations:
   See Attachment 1

10. Plaintiff prays for judgment for costs of suit; for such relief as is fair, just, and equitable; and for
   a. ☐ damages of: $
   b. ☐ interest on the damages
     (1) ☐ according to proof
     (2) ☐ at the rate of *(specify):*   percent per year from *(date):*
   c. ☑ attorney's fees
     (1) ☐ of: $
     (2) ☑ according to proof.
   d. ☑ other *(specify):*
     See Attachment 2

11. ☐ The paragraphs of this pleading alleged on information and belief are as follows *(specify paragraph numbers):*

Date: May 23, 2016

Jack Russo, Esq.
_____
(TYPE OR PRINT NAME)

▶ *(signature)* Jack Russo
_____
(SIGNATURE OF PLAINTIFF OR ATTORNEY)

*(If you wish to verify this pleading, affix a verification.)*

PLD-C-001 [Rev. January 1, 2007]      **COMPLAINT—Contract**      Page 2 of 2

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Bradski et al. v. Magic Leap, Inc. | |

ATTACHMENT *(Number):*  1

*(This Attachment may be used with any Judicial Council form.)*

**FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF**
**Against Defendant Magic Leap, Inc.**

12.  Plaintiffs incorporate each of the allegations in ¶¶1–11 as if set forth here in their entirety.

13.  Plaintiff Gary Bradski entered into a written contract with Magic Leap, Inc. on or about September 8, 2013 ("Bradski Agreement"). A true and correct copy of the Bradski Agreement is attached as **Exhibit 1** and incorporated by this reference.

14.  Plaintiff Adrian Kaehler entered into a written contract with Magic Leap, Inc. on or about November 1, 2013 ("Kaehler Agreement"). A true and correct copy of the Kaehler Agreement is attached as **Exhibit 2** and incorporated by this reference.

15.  On May 19, 2016, counsel for Magic Leap contacted counsel for Plaintiffs and accused Plaintiffs of misconduct that, according to Magic Leap, is potentially in breach of their respective Agreements or otherwise provides grounds for Magic Leap to terminate each Plaintiff "for cause" under their respective Agreements.

16.  Each Plaintiff also owns the right, title, and interest in certain vested and unvested stock options granted by Magic Leap as compensation for their work as employees of Magic Leap.

17.  Magic Leap also maintains that under the Magic Leap, Inc. 2012 Equity Incentive Plan ("Equity Plan"), Magic Leap is entitled to claim forfeiture in its favor of all of all or some portion of each Plaintiff's vested and/or unvested stock options as a result of the misconduct of which it accuses each Plaintiff. A true and correct copy of the Equity Plan is attached as **Exhibit 3** and incorporated by this reference.

18.  Accordingly, an actual and present controversy has arisen between each Plaintiff on the one hand, and Magic Leap, on the other, and Plaintiffs, and each of them, seek a declaration as to the rights and duties of the parties and the following questions of construction or validity under the Bradski and Kaehler Agreements and the Equity Plan, including:

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page  1  of  3
*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
to Judicial Council Form

www.courtinfo.ca.gov

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Bradski et al. v. Magic Leap, Inc. | |

ATTACHMENT (Number): ___1___

*(This Attachment may be used with any Judicial Council form.)*

(a)     What is the correct good faith and reasonable meaning of the "ongoing consulting work" proviso on page 2 of each of the Bradski and Kaehler Agreements?

(b)     What is correct good faith and reasonable meaning of the phrase "other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved"?

(c)     Do CEO's Rony Abovitz's interview responses in the article by Peter Yang, *The Untold Story of Magic Leap, the World's Most Secretive Startup* (published by WIRED online in April 2016 and in print in May 2016), describing the Magic Leap business a correct description of the business in which the Company is now involved?

(d)     How are any of the activities of either Dr. Bradski or Dr. Kaehler "directly related" to the existing business of Magic Leap?

(e)     Given the above contractual rights that Dr. Bradski has in this case (and under the California Labor Code and under § 16600 of the California Business & Professions Code) what is the "dishonesty, fraud, serious or willful misconduct, unauthorized use or disclosure of confidential information or trade secrets, or conduct prohibited by law (except minor violations)" that has been found against Dr. Bradski? By whom? And based on what?

(f)     Given the above contractual rights that Dr. Kaehler has in this case (and under the California Labor Code and under Section 16600 of the California Business & Professions Code) what is the "dishonesty, fraud, serious or willful misconduct, unauthorized use or disclosure of confidential information or trade secrets, or conduct prohibited by law (except minor violations)" that has been found against Dr. Kaehler? By whom? And based on what?

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page __2__ or __3__

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
to Judicial Council Form

www.courtinfo.ca.gov

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Bradski et al. v. Magic Leap, Inc. | |

ATTACHMENT (Number): ___1___

*(This Attachment may be used with any Judicial Council form.)*

(g) Has there been any review of any of the foregoing issues with the Board of Directors or with any committee or sub-committee of the Board?

(h) If so, is there any written report or other resolution by them?

(i) Under the above-referenced Agreements must Defendants, and each of them, provide Plaintiffs, and each of them an opportunity to be heard by the Board (or a committee and/or subcommittee thereof) and/or an opportunity to cure and is any termination without allowing the same or without allowing the Court to promptly adjudicate the same a wrongful retaliation against Plaintiffs' rightful exercise of their respective rights under California law?

(j) Can Magic Leap compel Plaintiffs, or either of them, to forfeit their vested and unvested stock options based on the activities of Plaintiffs?

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page __3__ of __3__

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

www.courtinfo.ca.gov

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Bradski et al. v. Magic Leap, Inc. | |

ATTACHMENT *(Number):* ___2___

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, and each of them pray for judgment against Defendant Magic

Leap, Inc. and persons in control of or acting in concert with Defendant as follows:

A.      On the first cause of action, for a declaration of the rights and duties of the parties

and the following questions of construction or validity under the Bradski and Kaehler

Agreements and the Equity Plan:

(a)      What is the correct good faith and reasonable meaning of the "ongoing

consulting work" proviso on page 2 of each of the Bradski and Kaehler

Agreements?

(b)      What is correct good faith and reasonable meaning of the phrase "other

employment, occupation, consulting or other business activity directly

related to the business in which the Company is now involved"?

(c)      Do CEO's Rony Abovitz's interview responses in the article by Peter

Yang, *The Untold Story of Magic Leap, the World's Most Secretive

Startup* (published by WIRED online in April 2016 and in print in May

2016), describing the Magic Leap business a correct description of the

business in which the Company is now involved?

(d)      How are any of the activities of either Dr. Bradski or Dr. Kaehler "directly

related" to the existing business of Magic Leap?

(e)      Given the above contractual rights that Dr. Bradski has in this case (and

under the California Labor Code and under § 16600 of the California

Business & Professions Code) what is the "dishonesty, fraud, serious or

willful misconduct, unauthorized use or disclosure of confidential

information or trade secrets, or conduct prohibited by law (except minor

---

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this
Attachment are made under penalty of perjury.)*

Page __1__ of __2__

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
to Judicial Council Form

www.courtinfo.ca.gov

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Bradski et al. v. Magic Leap, Inc. | |

ATTACHMENT (Number): ___2___

*(This Attachment may be used with any Judicial Council form.)*

                        violations)" that has been found against Dr. Bradski?  By whom?  And
                        based on what?

(f)     Given the above contractual rights that Dr. Kaehler has in this case (and
             under the California Labor Code and under Section 16600 of the
             California Business & Professions Code) what is the "dishonesty, fraud,
             serious or willful misconduct, unauthorized use or disclosure of
             confidential information or trade secrets, or conduct prohibited by law
             (except minor violations)" that has been found against Dr. Kaehler?  By
             whom?  And based on what?

(g)    Has there been any review of any of the foregoing issues with the Board of
             Directors or with any committee or sub-committee of the Board?

(h)    If so, is there any written report or other resolution by them?

(i)     Under the above-referenced Agreements must Defendants, and each of
             them, provide Plaintiffs, and each of them an opportunity to be heard by
             the Board (or a committee and/or subcommittee thereof) and/or an
             opportunity to cure and is any termination without allowing the same or
             without allowing the Court to promptly adjudicate the same a wrongful
             retaliation against Plaintiffs' rightful exercise of their respective rights
             under California law?

(j)     Can Magic Leap compel Plaintiffs, or either of them, to forfeit their vested
             and unvested stock options based on the activities of Plaintiffs?

B.    For reasonable attorneys' fees and litigation expenses as permitted by law;

C.    For all costs of suit herein incurred; and

D.    For such other and further relief that the Court deems just and proper.

---

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page ___2___ of ___2___

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

www.courtinfo.ca.gov

# MAGIC LEAP, INC.

## EMPLOYMENT OFFER LETTER

September 9, 2013

Gary Bradski

Dear Mr. Bradski:

I am pleased to offer you a full time position with Magic Leap, Inc. (the "*Company*") as Vice President, Computer & Machine Vision, commencing on the date set forth above (the "*Employment Start Date*"). You will receive a monthly salary of $15,833.33, less applicable withholding, which will be paid in accordance with the Company's normal payroll procedures. You should note that the Company reserves the right to modify salaries from time to time as it deems necessary.

Further, provided that you shall fully perform all material services required hereunder and are not in material default hereof, you shall be entitled to the standard benefits package available to all employees of Company, which benefits shall, unless otherwise provided in the specific benefit, terminate upon the termination of your services as an employee of Company. Notwithstanding the foregoing, you shall be entitled to 20 days of vacation per year, and you may accrue no more than 30 days of vacation in aggregate at any time.

In addition to the above, we will recommend to the Company's Board of Directors at its next regularly scheduled meeting that you receive an incentive stock option to purchase Eight Hundred Thousand (800,000) shares of the Company's common stock (the "Time Based Unvested Shares") at an exercise price determined by the Board of Directors, which will be the current fair market value for such shares. These options will vest and become exercisable over a four-year period with 25% vesting on the one-year anniversary of your Employment Start Date and with the balance vesting equally every month thereafter over the following 36 months and will be subject to the terms and conditions of the Company's 2012 Equity Incentive Plan. Additionally, it is the Company's intention that that you receive a discretionary bonus in the form of an incentive stock option to purchase Two Hundred Thousand (200,000) shares of the Company's common stock (the "Launch Based Incentive Shares") at an exercise price determined by the Board of Directors, which will be the current fair market value at that time for such shares. These options would be granted on a fully-vested basis upon the successful wide public release of the Sensoryware product. Subject to the terms and conditions of the Plan and applicable law, your grant shall be Incentive Stock Options, or at your request, some portion of the total options amount may be granted as Nonqualified Stock Options. Company agrees to recommend to the Board of Directors a right by you to an early exercise of your options, as set forth in the following sentences. To the extent you have the right to early-exercise any of the options, or the Company agrees to amend any of the options following their grant to permit you to early-exercise such options, such options shall be Non-qualified Stock Options, with the

resulting unvested shares purchased being subject to the Company's repurchase right at the lower of the purchase price (being equivalent to the exercise price) and the fair market value of the stock on the repurchase date, which right will lapse under the vesting paradigm described as follows: 1/4th of the total Time Based Unvested Shares shall vest one year after the Start Date, and 1/48th of the total Time Based Unvested Shares shall vest in equal monthly installments thereafter, such that the Time Based Unvested Shares shall be fully vested on the 4-year anniversary of the Start Date, and the Launch Based Unvested Shares shall vest immediately upon a successful wide public launch of the Sensoryware system, such success to be determined by Company in its sole discretion. Upon such vesting, the Shares that have been purchased by you shall no longer be subject to the above repurchase price. The fair market value per share of the Company's common stock is determined by the Company's Board of Directors in good faith compliance with applicable guidance in order to avoid having the option be treated as deferred compensation under Section 409A of the Internal Revenue Code of 1986, as amended. There is no guarantee that the Internal Revenue Service will agree with this valuation. You should consult with your own tax advisor concerning the tax risks associated with accepting an option to purchase the Company's common stock.

You will be able to perform your services primarily in Palo Alto, California, and will be expected to travel to the Ft. Lauderdale offices as reasonably required by the Company. When you travel at Company's request in connection with your services pursuant to this Agreement, Company will cover your reasonable flight and other travel expenses in accordance with the Company's standard policies.

You should be aware that your employment with the Company is for no specified period and constitutes at-will employment. As a result, you are free to resign at any time, for any reason or for no reason. Similarly, the Company is free to conclude its employment relationship with you at any time, with or without cause, and with or without notice. The first 90 days of your employment is a probationary period. This is an opportunity for the Company to evaluate your performance. It also is an opportunity for you to decide whether you are happy being employed by the Company. The Company may extend the probationary period if it desires. Completion of the probationary period does not alter an employee's at-will status. Magic Leap will conduct a formal performance review at the end of the probationary period.

For purposes of federal immigration law, you will be required to provide to the Company documentary evidence of your identity and eligibility for employment in the United States. Such documentation must be provided to us within three (3) business days of your date of hire, or our employment relationship with you may be terminated.

You will work for the Company full time. You agree that, during the term of your employment with the Company, you will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of your employment, nor will you engage in any other activities that conflict with your obligations to the Company; provided, however, that you will be free to pursue ongoing consulting work consistent with your past practice.

As a Company employee, you will be expected to abide by Company rules and regulations. You will be specifically required to sign an acknowledgement that you have read and that you

-2-

understand the Company rules of conduct. You will be expected to sign and comply with the Company's Proprietary Information and Inventions Agreement attached as **Exhibit A**.

To indicate your acceptance of the Company's offer, please sign and date this letter in the space provided below and return it to me. A duplicate original is enclosed for your records. This letter and the agreement relating to proprietary rights between you and the Company set forth the terms of your employment with the Company and supersede any prior representations or agreements, whether written or oral. This letter may not be modified or amended except by a written agreement, signed by an officer of the Company and by you.

We look forward to working with you at Magic Leap, Inc.

Very truly yours,

**MAGIC LEAP, INC.**

By: _R J Burke_

Name: Russell Burke
Title: CFO

AGREED AND ACCEPTED:

By: _Gary Bradski_
Name: Gary Bradski

-3-

## EXHIBIT A

## PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

As a condition of my employment with Magic Leap, Inc. and its subsidiaries, affiliates, successors or assigns (collectively, the "*Company*"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following terms under this Proprietary Information and Inventions Agreement (this "*Intellectual Property Agreement*"):

1.    **Employment**

(a)    I understand and acknowledge that my employment with the Company is for an unspecified duration and constitutes "at-will" employment. I acknowledge that this employment relationship may be terminated at any time, with or without good cause or for any or no cause, at the option either of the Company or myself, with or without notice.

(b)    I agree that, during the term of my employment with the Company, I will not engage in any other employment, occupation, consulting or other business activity related to the business in which the Company is now involved or becomes involved during the term of my employment, nor will I engage in any other activities that conflict with my obligations to the Company.

2.    **Confidential Information**

(a)    **Company Information.** I agree at all times during the term of my employment (my "*Relationship with the Company*") and thereafter to hold in strictest confidence, and not to use except for the benefit of the Company or to disclose to any third party without written authorization of the Board of Directors of the Company, any Confidential Information of the Company. I understand that "*Confidential Information*" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, business plans, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my Relationship with the Company), market research, works of original authorship, intellectual property (including, but not limited to, unpublished works and undisclosed patents), photographs, negatives, digital images, software, computer programs, ideas, developments, inventions (whether or not patentable), processes, formulas, technology, designs, drawings and engineering, hardware configuration information, forecasts, strategies, marketing, finances or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation or inspection of parts or equipment. I further understand that Confidential Information does not include any of the foregoing items that has become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.

(b)    **Other Employer Information.** I agree that I will not, during my Relationship with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

(c)    **Third Party Information.** I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited

purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

3.      **Intellectual Property**

      (a)      **Assignment of Intellectual Property.**  I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title and interest in and to any original works of authorship, domain names, inventions, concepts, improvements, processes, methods or trade secrets, whether or not patentable or registrable under copyright or similar laws, that I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the service of the Company (collectively referred to as "*Intellectual Property*") and that (i) are developed using the equipment, supplies, facilities or Confidential Information of the Company, (ii) result from or are suggested by work performed by me for the Company, or (iii) relate to the Company business or to the actual or demonstrably anticipated research or development of the Company. The Intellectual Property will be the sole and exclusive property of the Company. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my Relationship with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. To the extent any Intellectual Property is not deemed to be work made for hire, then I will and hereby do assign all my right, title and interest in such Intellectual Property to the Company, except as provided in Section 3.

      (b)      **Patent and Copyright Registrations.**  I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Intellectual Property and any copyrights, patents, trademarks, domain names or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto and the execution of all applications, specifications, oaths, assignments and other instruments that the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company and its successors, assigns and nominees the sole and exclusive right, title and interest in and to such Intellectual Property and any copyrights, patents, trademarks, domain names or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Intellectual Property Agreement. If the Company is unable because of my mental or physical incapacity or for any other reason to secure my assistance in perfecting the rights transferred in this Intellectual Property Agreement, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent and copyright, trademark or domain name registrations thereon with the same legal force and effect as if executed by me. The designation and appointment of the Company and its duly authorized officers and agents as my agent and attorney in fact shall be deemed to be coupled with an interest and therefore irrevocable.

      (c)      **Maintenance of Records.**  I agree to keep and maintain adequate and current written records of all Intellectual Property made by me (solely or jointly with others) during the term of my Relationship with the Company. The records will be in the form of notes, sketches, drawings, works of original authorship, photographs, negatives or digital images or in any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

(d)     **Intellectual Property Retained and Licensed.** I provide below a list of all original works of authorship, inventions, developments, improvements, trademarks, designs, domain names, processes, methods and trade secrets that were made by me prior to my Relationship with the Company (collectively referred to as *"Prior Intellectual Property"*), that belong to me, that relate to the Company's proposed business, products or research and development, and that are not assigned to the Company hereunder; or, if no such list is attached, I represent that there is no such Prior Intellectual Property. If in the course of my Relationship with the Company, I incorporate into Company property any Prior Intellectual Property owned by me or in which I have an interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Intellectual Property as part of or in connection with such Company property.

Prior Intellectual Property:

| Title | Date | Identifying Number or Brief Description |
|---|---|---|
| All patents previously filed | & assigned to Intel Inc. | |
| All provisional patents filed | assigned | by Industrial Perception Inc. |
| All algorithms developed for | | OpenCV by myself or directed by me. |
| All publications published or in progress to this date by me. | | |

(e)     **Exception to Assignments.** I understand that the provisions of this Intellectual Property Agreement requiring assignment of Intellectual Property to the Company do not obligate me to assign or offer to assign to the Company any of my rights in an invention for which no equipment, supplies, facilities or trade secret information of the Company was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the Company or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the Company.

(f)     **Return of Company Documents.** I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all works of original authorship, domain names, original registration certificates, photographs, negatives, digital images, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment or other documents or property, or reproductions of any aforementioned items, developed by me pursuant to my Relationship with the Company or otherwise belonging to the Company or its successors or assigns. In the event of the termination of my Relationship with the Company, I agree to sign and deliver the *"Termination Certificate"* attached hereto as Appendix A.

4.     **Notification of New Employer**

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer or consulting client of my rights and obligations under this Intellectual Property Agreement.

5.     **Nondisparagement; Noncompetition; Diversion of Company Business**

(a)     During the period of my Relationship with the Company as an employee, consultant, officer and/or director (the *"Restricted Period"*), I will not engage in, be employed by, perform services

for, participate in the ownership, management, control or operation of, or otherwise be connected with or participate in, either directly or indirectly, any Competing Business or activity that is in any way competitive with the business or proposed business of the Company. I agree that this restriction is reasonable for my employment with the Company, but further agree that should a court exercising jurisdiction with respect to this Agreement find any such restriction invalid or unenforceable due to unreasonableness, either in period of time, geographical area, or otherwise, then in that event, such restriction is to be interpreted and enforced to the maximum extent which such court deems reasonable. The Company, in its sole discretion, may determine to waive the noncompetition provisions of this Section 5. Any such waiver shall not constitute a waiver of any noncompetition or forfeiture provisions of any other agreement between the Company and me. For the purpose of this Agreement "*Competing Business*" means any business who offers products or services that are directly or indirectly competitive with the products or services of the Company. A Competing Business includes any business pursuing research and development and/or offering products or services in competition with products or services which are, during and at the end of my Relationship with the Company as an employee consultant, officer and/or director, either (a) produced, marketed, distributed, sourced or otherwise commercially exploited by the Company or (b) in actual or demonstrably anticipated research or development by the Company.

(b)    During the Restricted Period and for a period of twelve (12) months thereafter, I will not divert or attempt to divert from the Company any business the Company enjoyed or solicited from its customers during the prior twelve (12)-month period, nor will I solicit or attempt to induce any customer, supplier, partner or other person or entity with whom the Company has, or is attempting to establish, a commercial relationship to cease or refrain from doing business with the Company or to alter its relationship with the Company in any way adverse to the Company.

(c)    During the Restricted Period and for a period of twelve (12) months thereafter, I will not (a) make any false, misleading or disparaging representations or statements with regard to the Company or the products or services of the Company to any third party or (b) make any statement to any third party that may impair or otherwise adversely affect the goodwill or reputation of the Company.

## 6.    No Solicitation of Employees

In consideration for my Relationship with the Company and other valuable consideration, receipt of which is hereby acknowledged, I agree that during the Restricted Period and for a period of twelve (12) months thereafter, I shall not solicit the employment of any person who shall then be employed by the Company (as an employee or consultant) or who shall have been employed by the Company (as an employee or consultant) within the prior twelve (12)-month period, on behalf of myself or any other person, firm, corporation, association or other entity, directly or indirectly.

## 7.    Representations

I represent that my performance of all the terms of this Intellectual Property Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my Relationship with the Company. I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict herewith. I agree to execute any proper oath or verify any proper document required to carry out the terms of this Intellectual Property Agreement.

## 8.    Equitable Relief

The Company and I each agree that disputes relating to or arising out of a breach of the covenants contained in this Intellectual Property Agreement may cause the Company or me, as applicable, to suffer irreparable harm and to have no adequate remedy at law. In the event of any such breach or default by a

party, or any threat of such breach or default, the other party will be entitled to injunctive relief, specific performance and other equitable relief. The parties further agree that no bond or other security shall be required in obtaining such equitable relief and hereby consents to the issuance of such injunction and to the ordering of specific performance.

## 9. General Provisions

(a) **Governing Law; Consent to Personal Jurisdiction.** This Intellectual Property Agreement will be governed by the laws of the State of California as they apply to contracts entered into and wholly to be performed within such State. I hereby expressly consent to the nonexclusive personal jurisdiction and venue of the state and federal courts located in the federal Northern District of California for any lawsuit filed there by either party arising from or relating to this Intellectual Property Agreement.

(b) **Entire Agreement.** This Intellectual Property Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us. No modification of or amendment to this Intellectual Property Agreement, or any waiver of any rights under this Intellectual Property Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Intellectual Property Agreement.

(c) **Severability.** If one or more of the provisions in this Intellectual Property Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

(d) **Successors and Assigns.** This Intellectual Property Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company and its successors and assigns.

IN WITNESS WHEREOF, the undersigned has executed this Proprietary Information and Inventions Agreement as of _9_ / _5_ , 2013.

By: _____

Name: __Gary Bradski__

Address: __4082 Nelson Dr__
__Palo Alto, CA__
__94306__

## APPENDIX A

### TERMINATION CERTIFICATE

This is to certify that I do not have in my possession, nor have I failed to return, any and all works of original authorship, domain names, original registration certificates, photographs, negatives, digital images, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, or other documents or property, or reproductions of any aforementioned items, belonging to Magic Leap, Inc. and its subsidiaries, affiliates, successors or assigns (collectively, the "Company").

I further certify that I have complied with all the terms of the Company's Proprietary Information and Inventions Agreement signed by me (the "*Intellectual Property Agreement*"), including the reporting of any Intellectual Property (as defined therein) conceived or made by me (solely or jointly with others) covered by the Intellectual Property Agreement.

I further agree that, in compliance with the Intellectual Property Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, methods, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I agree that for of twelve (12) months from this date, I shall not engage in, be employed by, perform services for, participate in the ownership, management, control or operation of, or otherwise be connected with or participate in, either directly or indirectly any Competing Business or activity that is in any way competitive with the business or proposed business of the Company. I agree that this restriction is reasonable for my employment with the Company, but further agree that should a court exercising jurisdiction with respect to this Agreement find any such restriction invalid or unenforceable due to unreasonableness, either in period of time, geographical area, or otherwise, then in that event, such restriction is to be interpreted and enforced to the maximum extent which such court deems reasonable. "*Competing Business*" means any business who offers products or services that are directly or indirectly competitive with the products or services of the Company. A Competing Business includes any business pursuing research and development and/or offering products or services in competition with products or services which are, during and at the end of my Relationship with the Company as an employee consultant, officer and/or director, either (a) produced, marketed, distributed, sourced or otherwise commercially exploited by the Company or (b) in actual or demonstrably anticipated research or development by the Company.]

I agree that for twelve (12) months from this date, I shall not to divert or attempt to divert from the Company any business the Company enjoyed or solicited from its customers during the prior twelve (12)-month period, nor will I solicit or attempt to induce any customer, supplier, partner or other person or entity with whom the Company has, or is attempting to establish, a commercial relationship to cease or refrain from doing business with the Company or to alter its relationship with the Company in any way adverse to the Company.

I agree that for twelve (12) months from this date, I shall not (a) make any false, misleading or disparaging representations or statements with regard to the Company or the products or services of the Company to any third party or (b) make any statement to any third party that may impair or otherwise adversely affect the goodwill or reputation of the Company.]

I further agree that for twelve (12) months from this date, I shall not solicit the employment of any person who shall then be employed by the Company (as an employee or consultant) or who shall have been employed by the Company (as an employee or consultant) within the prior twelve (12) month period, on behalf of myself or any other person, firm, corporation, association or other entity, directly or indirectly, all as provided more fully in the Intellectual Property Agreement.]

Dated: 9 / 8 / 2013

By: _____

Name: Gary Bradski

Confidential
Ana Lang
Magic Leap Inc.
May 12, 2016 15:11

DocuSign Envelope ID: 1FC11877-6281-4D3D-8C94-504A4D29F82B

## MAGIC LEAP, INC.

### EMPLOYMENT OFFER LETTER

November 1, 2013

Adrian Kaehler
1940 N. Western Ave.
Los Angeles, CA 90027

Dear Mr. Kaehler:

I am pleased to offer you a full time position with Magic Leap, Inc. (the "*Company*") as VP, Technology Solutions & Member of Technical Staff, Computer Vision, commencing as soon as possible – the date to be agreed by you and the Company (the "*Employment Start Date*").  You will receive a monthly salary of $17,083.33, less applicable withholding, which will be paid in accordance with the Company's normal payroll procedures.  You will report to Gary Bradski.  You should note that the Company reserves the right to modify salaries from time to time as it deems necessary.

Further, provided that you shall fully perform all material services required hereunder and are not in material default hereof, you shall be entitled to the standard benefits package available to all employees of Company, which benefits shall, unless otherwise provided in the specific benefit, terminate upon the termination of your services as an employee of Company.

In addition to the above, we will recommend to the Company's Board of Directors at its next regularly scheduled meeting that you receive an incentive stock option to purchase One Hundred Twenty Thousand (120,000) shares of the Company's common stock at an exercise price determined by the Board of Directors which will be the current fair market value for such shares.  Your options will vest and become exercisable over a four-year period with 25% vesting on the one-year anniversary of your Employment Start Date and with the balance vesting equally every month thereafter over the following 36 months and will be subject to the terms and conditions of the Company's 2012 Equity Incentive Plan.  The fair market value per share of the Company's common stock is determined by the Company's Board of Directors in good faith compliance with applicable guidance in order to avoid having the option be treated as deferred compensation under Section 409A of the Internal Revenue Code of 1986, as amended.  There is no guarantee that the Internal Revenue Service will agree with this valuation.  You should consult with your own tax advisor concerning the tax risks associated with accepting an option to purchase the Company's common stock.

You will also receive a one-time signing bonus of $7,000, less applicable withholding, which will be paid at the end of the first Company payroll period after your Employment Start Date in accordance with the Company's standard payroll procedures.  Likewise payable at the same time and also subject to the applicable withholding, the company will pay you a $20,000 relocation bonus for your move from Los Angeles to Palo Alto in lieu of reimbursing specific moving expenses.  .  If your employment is terminated prior to two (2) years from the Employment Start Date, either by yourself or the Company for material default of your obligations to the Company, you will be obligated to promptly return a portion of sums paid to you for relocation pursuant to

DocuSign Envelope ID: 1FC11877-6281-4D3D-8C94-504A4D29F82B

this paragraph, which amount shall be one twenty-fourth (1/24) of such sums times the number of months remaining after termination and prior to the second anniversary of your employment..

You will be able to perform your services primarily in Palo Alto, California, and will be expected to travel to the Ft. Lauderdale offices as reasonably required by the Company. When you travel at Company's request in connection with your services pursuant to this Agreement, Company will cover your reasonable flight and other travel expenses.

You should be aware that your employment with the Company is for no specified period and constitutes at-will employment. As a result, you are free to resign at any time, for any reason or for no reason. Similarly, the Company is free to conclude its employment relationship with you at any time, with or without cause, and with or without notice.

For purposes of federal immigration law, you will be required to provide to the Company documentary evidence of your identity and eligibility for employment in the United States. Such documentation must be provided to us within three (3) business days of your date of hire, or our employment relationship with you may be terminated.

You will work for the Company full time. You agree that, during the term of your employment with the Company, you will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of your employment, nor will you engage in any other activities that conflict with your obligations to the Company; provided, however, that you will be free to pursue ongoing consulting work consistent with your past practice.

As a Company employee, you will be expected to abide by Company rules and regulations. You will be specifically required to sign an acknowledgement that you have read and that you understand the Company rules of conduct. You will be expected to sign and comply with the Company's Proprietary Information and Inventions Agreement attached as **Exhibit A**.

To indicate your acceptance of the Company's offer, please sign and date this letter in the space provided below and return it to me. A duplicate original is enclosed for your records. This letter and the agreement relating to proprietary rights between you and the Company set forth the terms of your employment with the Company and supersede any prior representations or agreements, whether written or oral. This letter may not be modified or amended except by a written agreement, signed by an officer of the Company and by you.

1FC11877-6281-4D3D-8C94-504A4D29F82B

DocuSign Envelope ID: 1FC11877-6281-4D3D-8C94-504A4D29F82B

We look forward to working with you at Magic Leap, Inc.

Very truly yours,

**MAGIC LEAP, INC.**

By
Name: Rony Abovitz
Title: President & CEO

AGREED AND ACCEPTED:

By:
Name: Adrian Kaehler

Confidential
Ana Lang
Magic Leap Inc.
May 12, 2016 15:14

DocuSign Envelope ID: 1FC11877-6281-4D3D-8C94-504A4D29F82B

## EXHIBIT A

### PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

As a condition of my employment with Magic Leap, Inc. and its subsidiaries, affiliates, successors or assigns (collectively, the "*Company*"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following terms under this Proprietary Information and Inventions Agreement (this "*Intellectual Property Agreement*"):

1.    **Employment**

(a)    I understand and acknowledge that my employment with the Company is for an unspecified duration and constitutes "at-will" employment. I acknowledge that this employment relationship may be terminated at any time, with or without good cause or for any or no cause, at the option either of the Company or myself, with or without notice.

(b)    I agree that, during the term of my employment with the Company, I will not engage in any other employment, occupation, consulting or other business activity related to the business in which the Company is now involved or becomes involved during the term of my employment, nor will I engage in any other activities that materially conflict with my obligations to the Company.

2.    **Confidential Information**

(a)    **Company Information.** I agree at all times during the term of my employment (my "*Relationship with the Company*") and thereafter to hold in strictest confidence, and not to use except for the benefit of the Company or to disclose to any third party without written authorization of the Board of Directors of the Company or as necessary to carry out assignment I have been given, any Confidential Information of the Company. I understand that "*Confidential Information*" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, business plans, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my Relationship with the Company), market research, works of original authorship, intellectual property (including, but not limited to, unpublished works and undisclosed patents), photographs, negatives, digital images, software, computer programs, ideas, developments, inventions (whether or not patentable), processes, formulas, technology, designs, drawings and engineering, hardware configuration information, forecasts, strategies, marketing, finances or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation or inspection of parts or equipment. I further understand that Confidential Information does not include any of the foregoing items that has become publicly known and made generally available through no wrongful act of mine or known fault of others who were under confidentiality obligations as to the item or items involved.

(b)    **Other Employer Information.** I agree that I will not, during my Relationship with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

(c)    **Third Party Information.** I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited

DocuSign Envelope ID: 1FC11877-6281-4D3D-8C94-504A4D29F82B

purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

3.      **Intellectual Property**

        (a)     **Assignment of Intellectual Property.** I agree that I will promptly make full written disclosure to the Company, and will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title and interest in and to any original works of authorship, domain names, inventions, concepts, improvements, processes, methods or trade secrets, whether or not patentable or registrable under copyright or similar laws, that I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the service of the Company (collectively referred to as "*Intellectual Property*") and that (i) are developed using the equipment, supplies, facilities or Confidential Information of the Company, (ii) result from or are suggested by work performed by me for the Company, or (iii) relate to the Company business or to the actual or demonstrably anticipated research or development of the Company. The Intellectual Property will be the sole and exclusive property of the Company. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my Relationship with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. To the extent any Intellectual Property is not deemed to be work made for hire, then I will and hereby do assign all my right, title and interest in such Intellectual Property to the Company, except as provided in Section 3(e).

        (b)     **Patent and Copyright Registrations.** I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Intellectual Property and any copyrights, patents, trademarks, domain names or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto and the execution of all applications, specifications, oaths, assignments and other instruments that the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company and its successors, assigns and nominees the sole and exclusive right, title and interest in and to such Intellectual Property and any copyrights, patents, trademarks, domain names or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Intellectual Property Agreement. If the Company is unable because of my mental or physical incapacity or for any other reason to secure my assistance in perfecting the rights transferred in this Intellectual Property Agreement, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent and copyright, trademark or domain name registrations thereon with the same legal force and effect as if executed by me. The designation and appointment of the Company and its duly authorized officers and agents as my agent and attorney in fact shall be deemed to be coupled with an interest and therefore irrevocable.

        (c)     **Maintenance of Records.** I agree to keep and maintain adequate and current written records of all Intellectual Property made by me (solely or jointly with others) during the term of my Relationship with the Company. The records will be in the form of notes, sketches, drawings, works of original authorship, photographs, negatives or digital images or in any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

DocuSign Envelope ID: 1FC11877-6281-4D3D-8C94-504A4D29F82B

(d)    **Intellectual Property Retained and Licensed.**  I provide below a list of all original works of authorship, inventions, developments, improvements, trademarks, designs, domain names, processes, methods and trade secrets that were made by me prior to my Relationship with the Company and to which I presently hold any intellectual property rights (collectively referred to as "*Prior Intellectual Property*"), that belong to me, that relate to the Company's proposed business, products or research and development, and that are not assigned to the Company hereunder; or, if no such list is attached, I represent that there is no such Prior Intellectual Property.  If in the course of my Relationship with the Company, I incorporate into Company property any Prior Intellectual Property owned by me or in which I have an interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Intellectual Property as part of or in connection with such Company property.

Prior Intellectual Property:

| Title | Date | Identifying Number or Brief Description |
|-------|------|-----------------------------------------|
|       |      |                                         |
|       |      |                                         |
|       |      |                                         |

(e)    **Exception to Assignments.**  I understand that the provisions of this Intellectual Property Agreement requiring assignment of Intellectual Property to the Company are limited to Section 2870 of the California Labor Code, which is attached hereto as Appendix A and do not apply to any intellectual property that (i) I develop entirely on my own time; and (ii) I develop without using Company equipment, supplies, facilities or trade secret information; and (iii) does not result from any work performed by me for the Company; and (iv) does not relate at the time of conception or reduction to practice to the Company's current or anticipated business or to its actual or demonstrably anticipated research or development.  Any such intellectual property will be owned entirely by me, even if developed by me during the time period in which I am employed by the Company.  I will advise the Company promptly in writing of any intellectual property that I believe meets the criteria for exclusion set forth herein and is not otherwise disclosed pursuant to Section 3(d) above.

(f)    **Return of Company Documents**.  I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all works of original authorship, domain names, original registration certificates, photographs, negatives, digital images, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment or other documents or property, or reproductions of any aforementioned items, developed by me pursuant to my Relationship with the Company or otherwise belonging to the Company or its successors or assigns.  In the event of the termination of my Relationship with the Company, I agree to sign and deliver the "*Termination Certificate*" attached hereto as Appendix B.

4.    **Notification of New Employer**

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company within one year of my termination to my new employer or consulting client of my rights and obligations under this Intellectual Property Agreement.

DocuSign Envelope ID: 1FC11877-6281-4D3D-8C94-504A4D29F82B

5.     **Nondisparagement; Noncompetition; Diversion of Company Business**

(a)     During the period of my Relationship with the Company as an employee, consultant, officer and/or director and for a period of twelve (12) months thereafter (the "Restricted Period"), I will not engage in, be employed by, perform services for, participate in the ownership, management, control or operation of, or otherwise be connected with or participate in, either directly or indirectly, any Competing Business or activity that is in any way competitive with the business or proposed business of the Company. I agree that this restriction is reasonable for my employment with the Company, but further agree that should a court exercising jurisdiction with respect to this Agreement find any such restriction invalid or unenforceable due to unreasonableness, either in period of time, geographical area, or otherwise, then in that event, such restriction is to be interpreted and enforced to the maximum extent which such court deems reasonable. The Company, in its sole discretion, may determine to waive the noncompetition provisions of this Section 5. Any such waiver shall not constitute a waiver of any noncompetition or forfeiture provisions of any other agreement between the Company and me. For the purpose of this Agreement "Competing Business" means any business who offers products or services that are directly or indirectly competitive with the products or services of the Company. A Competing Business includes any business pursuing research and development and/or offering products or services in competition with products or services which are, during and at the end of my Relationship with the Company as an employee, consultant, officer and/or director, either (a) produced, marketed, distributed, sourced or otherwise commercially exploited by the Company or (b) in actual or demonstrably anticipated research or development by the Company.

(b)     During the Restricted Period, I will not divert or attempt to divert from the Company any business the Company enjoyed or solicited from its customers during the prior twelve (12)-month period, nor will I solicit or attempt to induce any customer, supplier, partner or other person or entity with whom the Company has, or is attempting to establish, a commercial relationship to cease or refrain from doing business with the Company or to alter its relationship with the Company in any way adverse to the Company.

(c)     During the Restricted Period, I will not (1) make any false, misleading or disparaging representations or statements with regard to the Company or the products or services of the Company to any third party or (2) make any statement to any third party that may impair or otherwise adversely affect the goodwill or reputation of the Company. Likewise during the Restricted Period, the Company will not (3) make any false, misleading or disparaging representations or statements with regard to my performance, services or capabilities to any third party or (4) make any statement to any third party that may impair or otherwise adversely affect the goodwill or reputation I may have with such party.

6.     **No Solicitation of Employees**

In consideration for my Relationship with the Company and other valuable consideration, receipt of which is hereby acknowledged, I agree that during the Restricted Period, I shall not solicit the employment of any person who shall then be employed by the Company (as an employee or consultant) or who shall have been employed by the Company (as an employee or consultant) within the prior twelve (12)-month period, on behalf of myself or any other person, firm, corporation, association or other entity, directly or indirectly.

7.     **Representations**

I represent that my performance of all the terms of this Intellectual Property Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my Relationship with the Company. I have not entered into, and I agree I will not enter into, any

DocuSign Envelope ID: 1FC11877-6281-4D3D-8C94-504A4D29F82B

oral or written agreement in conflict herewith. I agree to execute, at Company's expense, any proper oath or verify any proper document required to carry out the terms of this Intellectual Property Agreement.

**8.    Equitable Relief**

The Company and I each agree that disputes relating to or arising out of a breach of the covenants contained in this Intellectual Property Agreement may cause the Company or me, as applicable, to suffer irreparable harm and to have no adequate remedy at law. In the event of any such breach or default by a party, or any threat of such breach or default, the other party will be entitled to injunctive relief, specific performance and other equitable relief. The parties further agree that no bond or other security shall be required in obtaining such equitable relief and hereby consents to the issuance of such injunction and to the ordering of specific performance.

**9.    General Provisions**

(a)    **Governing Law; Consent to Personal Jurisdiction**. This Intellectual Property Agreement will be governed by the laws of the State of California as they apply to contracts entered into and wholly to be performed within such State. I hereby expressly consent to the nonexclusive personal jurisdiction and venue of the state and federal courts located in the federal Northern District of California for any lawsuit filed there by either party arising from or relating to this Intellectual Property Agreement.

(b)    **Entire Agreement**. This Intellectual Property Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us. No modification of or amendment to this Intellectual Property Agreement, or any waiver of any rights under this Intellectual Property Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Intellectual Property Agreement.

(c)    **Severability**. If one or more of the provisions in this Intellectual Property Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

(d)    **Successors and Assigns**. This Intellectual Property Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company and its successors and assigns.

(e)    **Attorney Fees**. In the event of a dispute arising under this Agreement, whether or not a lawsuit or other proceeding is filed, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs, including attorneys' fees and costs incurred in litigating entitlement to attorneys' fees and costs, as well as in determining or quantifying the amount of recoverable attorneys' fees and costs. The reasonable costs to which the prevailing party is entitled shall include costs that are taxable under any applicable statute, rule, or guideline, as well as non-taxable costs, including, but not limited to, costs of investigation, copying costs, electronic discovery costs, telephone charges, mailing and delivery charges, information technology support charges, consultant and expert witness fees, travel expenses, court reporter fees, and mediator fees, regardless of whether such costs are otherwise taxable.

(f)    **Counterparts**. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together shall constitute one and the same instrument. Once signed, any reproduction of this Agreement made by reliable means (e.g., photocopy, facsimile) is considered an original.

DocuSign Envelope ID: 1FC11877-6281-4D3D-8C94-504A4D29F82B

(g)     **Notice.**  Any notice required or permitted to be given by one Party to the other under this Agreement (including a change of Notice Address) shall be in writing and be given as follows:  Notice shall be in writing and be deemed given and effective upon the earlier of (1) actual delivery to the Notice Address by courier or similar receipted means; (2) five (5) business days after mailing to the Notice Address, postage fully prepaid and return receipt requested, by Express, certified or registered United States mail; or (3) the second business day after successful transmittal by facsimile to the other Party if on or before the next business day following such transmittal a copy is also given pursuant to (1) or (2) of this Paragraph.  My current Notice Address is below with my signature and the Company's is its current Florida address.

IN WITNESS WHEREOF, the undersigned has executed this Proprietary Information and Inventions Agreement as of November 1, 2013.

By: _____

Name: ADRIAN KAEHLER

Address:

1940 N. WESTERN AVE.

LOS ANGELES, CA

90027

**WITNESS:**

By: _____

Name: _____

Address:

_____

_____

_____

Confidential
Ana Lang
Magic Leap Inc.
May 12, 2016 15:14

DocuSign Envelope ID: 1FC11877-6281-4D3D-8C94-504A4D29F82B

## APPENDIX A

## CALIFORNIA LABOR CODE SECTION 2870

Application of provision that employee shall assign or offer to assign rights in invention to employer.

(a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2)    Result from any work performed by the employee for the employer.

(b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

Confidential
Ana Lang
Magic Leap Inc.
May 12, 2016 15:14

A-1

DocuSign Envelope ID: 1FC11877-6281-4D3D-8C94-504A4D29F82B

## APPENDIX B

### TERMINATION CERTIFICATE

This is to certify that I do not have in my possession, nor have I failed to return, any and all works of original authorship, domain names, original registration certificates, photographs, negatives, digital images, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, or other documents or property, or reproductions of any aforementioned items, belonging to Magic Leap, Inc. and its subsidiaries, affiliates, successors or assigns (collectively, the "Company").

I further certify that I have complied with all the terms of the Company's Proprietary Information and Inventions Agreement signed by me (the "*Intellectual Property Agreement*"), including the reporting of any Intellectual Property (as defined therein) conceived or made by me (solely or jointly with others) covered by the Intellectual Property Agreement.

I further agree that, in compliance with the Intellectual Property Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, methods, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months from this date, I shall not solicit the employment of any person who shall then be employed by the Company (as an employee or consultant) or who shall have been employed by the Company (as an employee or consultant) within the prior twelve (12) month period, on behalf of myself or any other person, firm, corporation, association or other entity, directly or indirectly, all as provided more fully in the Intellectual Property Agreement.

Dated: 11/1/2013

By: _____

Name: ADRIAN KAEHLER

A-1

MAGIC LEAP, INC.

2012 EQUITY INCENTIVE PLAN

SECTION 1. PURPOSE

The purpose of the Magic Leap, Inc. 2012 Equity Incentive Plan is to attract, retain and motivate employees, officers, directors, consultants, agents, advisors and independent contractors of the Company and its Related Companies by providing them the opportunity to acquire a proprietary interest in the Company and to align their interests and efforts to the long-term interests of the Company's stockholders.

SECTION 2. DEFINITIONS

Certain capitalized terms used in the Plan have the meanings set forth in Appendix A.

SECTION 3. ADMINISTRATION

**3.1**     **Administration of the Plan**

The Plan shall be administered by the Board.  All references in the Plan to the "***Plan Administrator***" shall be to the Board.

**3.2**     **Administration and Interpretation by Plan Administrator**

(a)     Except for the terms and conditions explicitly set forth in the Plan and to the extent permitted by applicable law, the Plan Administrator shall have full power and exclusive authority, subject to such orders or resolutions not inconsistent with the provisions of the Plan as may from time to time be adopted by the Board, to (i) select the Eligible Persons to whom Awards may from time to time be granted under the Plan; (ii) determine the type or types of Award to be granted to each Participant under the Plan; (iii) determine the number of shares of Common Stock to be covered by each Award granted under the Plan; (iv) determine the terms and conditions of any Award granted under the Plan; (v) approve the forms of notice or agreement for use under the Plan; (vi) determine whether, to what extent and under what circumstances Awards may be settled in cash, shares of Common Stock or other property or canceled or suspended; (vii) interpret and administer the Plan and any instrument evidencing an Award, notice or agreement executed or entered into under the Plan; (viii) establish such rules and regulations as it shall deem appropriate for the proper administration of the Plan; (ix) delegate ministerial duties to such of the Company's employees as it so determines; and (x) make any other determination and take any other action that the Plan Administrator deems necessary or desirable for administration of the Plan.

(b)     The effect on the vesting of an Award of a Company-approved leave of absence or a Participant's reduction in hours of employment or service shall be determined by the Company's chief human resources officer or other person performing that function or, with respect to directors or executive officers, by the Board, whose determination shall be final.

(c)     Decisions of the Plan Administrator shall be final, conclusive and binding on all persons, including the Company, any Participant, any stockholder and any Eligible Person. A majority of the members of the Plan Administrator may determine its actions.

## SECTION 4. SHARES SUBJECT TO THE PLAN

### 4.1     Authorized Number of Shares

Subject to adjustment from time to time as provided in Section 14.1, a maximum of 33,969,223 shares of Common Stock shall be available for issuance under the Plan. Shares issued under the Plan shall be drawn from authorized and unissued shares or shares now held or subsequently acquired by the Company as treasury shares.

### 4.2     Share Usage

(a)     Shares of Common Stock covered by an Award shall not be counted as used unless and until they are actually issued and delivered to a Participant. If any Award lapses, expires, terminates or is canceled prior to the issuance of shares thereunder or if shares of Common Stock are issued under the Plan to a Participant and thereafter are forfeited to or otherwise reacquired by the Company, the shares subject to such Awards and the forfeited or reacquired shares shall again be available for issuance under the Plan. Any shares of Common Stock (i) tendered by a Participant or retained by the Company as full or partial payment to the Company for the purchase price of an Award or to satisfy tax withholding obligations in connection with an Award, or (ii) covered by an Award that is settled in cash or in a manner such that some or all of the shares covered by the Award are not issued, shall be available for Awards under the Plan. The number of shares of Common Stock available for issuance under the Plan shall not be reduced to reflect any dividends or dividend equivalents that are reinvested into additional shares of Common Stock or credited as additional shares of Common Stock subject or paid with respect to an Award.

(b)     The Plan Administrator shall also, without limitation, have the authority to grant Awards as an alternative to or as the form of payment for grants or rights earned or due under other compensation plans or arrangements of the Company.

(c)     Notwithstanding any other provision of the Plan to the contrary, the Plan Administrator may grant Substitute Awards under the Plan. In the event that a written agreement between the Company and an Acquired Entity pursuant to which a merger or consolidation is completed is approved by the Board and that agreement sets forth the terms and conditions of the substitution for or assumption of outstanding awards of the Acquired Entity, those terms and conditions shall be deemed to be the action of the Plan Administrator

without any further action by the Plan Administrator, and the persons holding such awards shall be deemed to be Participants.

(d)     Notwithstanding any other provisions in this Section 4.2 to the contrary, the maximum number of shares that may be issued upon the exercise of Incentive Stock Options shall equal the aggregate share number stated in Section 4.1, subject to adjustment as provided in Section 14.1.

## SECTION 5. ELIGIBILITY

An Award may be granted to any employee, officer or director of the Company or a Related Company whom the Plan Administrator from time to time selects.  An Award may also be granted to any consultant, agent, advisor or independent contractor for bona fide services rendered to the Company or any Related Company that (a) are not in connection with the offer and sale of the Company's securities in a capital-raising transaction and (b) do not directly or indirectly promote or maintain a market for the Company's securities.

## SECTION 6.  AWARDS

### 6.1     Form, Grant and Settlement of Awards

The Plan Administrator shall have the authority, in its sole discretion, to determine the type or types of Awards to be granted under the Plan.  Such Awards may be granted either alone or in addition to or in tandem with any other type of Award.  Any Award settlement may be subject to such conditions, restrictions and contingencies as the Plan Administrator shall determine.

### 6.2     Evidence of Awards

Awards granted under the Plan shall be evidenced by a written, including an electronic, instrument that shall contain such terms, conditions, limitations and restrictions as the Plan Administrator shall deem advisable and that are not inconsistent with the Plan.

### 6.3     Dividends and Distributions

Participants may, if the Plan Administrator so determines, be credited with dividends or dividend equivalents paid with respect to shares of Common Stock underlying an Award in a manner determined by the Plan Administrator in its sole discretion.  The Plan Administrator may apply any restrictions to the dividends or dividend equivalents that the Plan Administrator deems appropriate.  The Plan Administrator, in its sole discretion, may determine the form of payment of dividends or dividend equivalents, including cash, shares of Common Stock, Restricted Stock or Stock Units.  Notwithstanding the foregoing, the right to any dividends or dividend equivalents declared and paid on the number of shares underlying an Option or Stock Appreciation Right may not be contingent, directly or indirectly, on the exercise of the Option or Stock Appreciation Right, and must comply with or qualify for an exemption under Section 409A.  Also notwithstanding the foregoing, the

right to any dividends or dividend equivalents declared and paid on Restricted Stock must (a) be paid at the same time they are paid to other stockholders and (b) comply with or qualify for an exemption under Section 409A.

## SECTION 7. OPTIONS

### 7.1    Grant of Options

The Plan Administrator may grant Options designated as Incentive Stock Options or Nonqualified Stock Options.

### 7.2    Option Exercise Price

Options shall be granted with an exercise price per share not less than 100% of the Fair Market Value of the Common Stock on the Grant Date (and not less than the minimum exercise price required by Section 422 of the Code with respect to Incentive Stock Options), except in the case of Substitute Awards.  Notwithstanding the foregoing, the Plan Administrator may grant Nonqualified Stock Options with an exercise price per share of less than the Fair Market Value of the Common Stock on the Grant Date if the Option meets all the requirements for Awards that are considered "deferred compensation" within the meaning of Section 409A.

### 7.3    Term of Options

Subject to earlier termination in accordance with the terms of the Plan and the instrument evidencing the Option, the maximum term of an Option (the "*Option Term*") shall be ten years from the Grant Date.  For Incentive Stock Options, the Option Term shall be as specified in Section 8.4.

### 7.4    Exercise of Options

The Plan Administrator shall establish and set forth in each instrument that evidences an Option the time at which, or the installments in which, the Option shall vest and become exercisable, any of which provisions may be waived or modified by the Plan Administrator at any time.  If not so established in the instrument evidencing the Option, the Option shall vest and become exercisable according to the following schedule, which may be waived or modified by the Plan Administrator at any time

| Period of Participant's Continuous Employment or Service With the Company or Its Related Companies From the Vesting Commencement Date | Portion of Total Option That Is Vested and Exercisable |
|---|---|
| After 1 year | 1/4th |
| After each additional one-month period of continuous service completed thereafter | An additional 1/48th |

-4-

After 4 years                                    100%

To the extent an Option has vested and become exercisable, the Option may be exercised in whole or from time to time in part by delivery to or as directed or approved by the Company of a properly executed stock option exercise agreement or notice, in a form and in accordance with procedures established by the Plan Administrator, setting forth the number of shares with respect to which the Option is being exercised, the restrictions imposed on the shares purchased under such exercise agreement or notice, if any, and such representations and agreements as may be required by the Plan Administrator, accompanied by payment in full as described in Section 7.5. An Option may be exercised only for whole shares and may not be exercised for less than a reasonable number of shares at any one time, as determined by the Plan Administrator.

**7.5    Payment of Exercise Price**

The exercise price for shares purchased under an Option shall be paid in full to the Company by delivery of consideration equal to the product of the Option exercise price and the number of shares purchased. Such consideration must be paid before the Company will issue the shares being purchased and must be in a form or a combination of forms acceptable to the Plan Administrator for that purchase, which forms may include:

(a)    cash;

(b)    check or wire transfer;

(c)    having the Company withhold shares of Common Stock that would otherwise be issued on exercise of the Option that have an aggregate Fair Market Value equal to the aggregate exercise price of the shares being purchased under the Option;

(d)    tendering (either actually or, if and so long as the Common Stock is registered under Section 12(b) or 12(g) of the Exchange Act, by attestation) shares of Common Stock owned by the Participant that have an aggregate Fair Market Value equal to the aggregate exercise price of the shares being purchased under the Option;

(e)    if and so long as the Common Stock is registered under Section 12(b) or 12(g) of the Exchange Act, and to the extent permitted by law, delivery of a properly executed exercise agreement or notice, together with irrevocable instructions to a brokerage firm designated or approved by the Company to deliver promptly to the Company the aggregate amount of proceeds to pay the Option exercise price and any tax withholding obligations that may arise in connection with the exercise, all in accordance with the regulations of the Federal Reserve Board; or

(f)    such other consideration as the Plan Administrator may permit.

In addition, to assist a Participant (including directors and executive officers) in acquiring shares of Common Stock pursuant to an Option granted under the Plan, the Plan

81571-0001/LEGAL23780120.3

Administrator, in its sole discretion and to the extent permitted by applicable law, may authorize, either at the Grant Date or at any time before the acquisition of Common Stock pursuant to the Option, (i) the payment by a Participant of the purchase price of the Common Stock by a promissory note or (ii) the guarantee by the Company of a loan obtained by the Participant from a third party. Such notes or loans may be full recourse or partial recourse, as determined by the Plan Administrator. Subject to the foregoing, the Plan Administrator shall in its sole discretion specify the terms of any loans or loan guarantees, including the interest rate and terms of and security for repayment.

### 7.6    Effect of Termination of Service

The Plan Administrator shall establish and set forth in each instrument that evidences an Option whether the Option shall continue to be exercisable, and the terms and conditions of such exercise, after a Termination of Service, any of which provisions may be waived or modified by the Plan Administrator at any time. If not so established in the instrument evidencing the Option, the Option shall be exercisable according to the following terms and conditions, which may be waived or modified by the Plan Administrator at any time:

(a)     Any portion of an Option that is not vested and exercisable on the date of a Participant's Termination of Service shall expire on such date.

(b)     Any portion of an Option that is vested and exercisable on the date of a Participant's Termination of Service shall expire on the earliest to occur of:

    (i)     if the Participant's Termination of Service occurs for reasons other than Cause, Retirement, Disability or death, the date that is three months after such Termination of Service;

    (ii)     if the Participant's Termination of Service occurs by reason of Retirement, Disability or death, the one-year anniversary of such Termination of Service; and

    (iii)     the Option Expiration Date.

Notwithstanding the foregoing, if a Participant dies after the Participant's Termination of Service but while an Option is otherwise exercisable, the portion of the Option that is vested and exercisable on the date of such Termination of Service shall expire upon the earlier to occur of (y) the Option Expiration Date and (z) the one-year anniversary of the date of death, unless the Plan Administrator determines otherwise.

Also notwithstanding the foregoing, in case a Participant's Termination of Service occurs for Cause, all Options granted to the Participant shall automatically expire upon first notification to the Participant of such termination, unless the Plan Administrator determines otherwise. If a Participant's employment or service relationship with the Company is suspended pending an investigation of whether the Participant shall be terminated for Cause, all the Participant's rights under any Option shall likewise be suspended during the period of investigation. If any facts that would constitute termination for Cause are discovered after a Participant's

-6-

Termination of Service, any Option then held by the Participant may be immediately terminated by the Plan Administrator, in its sole discretion.

## SECTION 8.  INCENTIVE STOCK OPTION LIMITATIONS

Notwithstanding any other provisions of the Plan to the contrary, the terms and conditions of any Incentive Stock Options shall in addition comply in all respects with Section 422 of the Code, or any successor provision, and any applicable regulations thereunder, including, to the extent required thereunder, the following:

### 8.1     Dollar Limitation

To the extent the aggregate Fair Market Value (determined as of the Grant Date) of Common Stock with respect to which a Participant's Incentive Stock Options become exercisable for the first time during any calendar year (under the Plan and all other stock option plans of the Company and its parent and subsidiary corporations) exceeds $100,000, such portion in excess of $100,000 shall be treated as a Nonqualified Stock Option.  In the event the Participant holds two or more such Options that become exercisable for the first time in the same calendar year, such limitation shall be applied on the basis of the order in which such Options are granted.

### 8.2     Eligible Employees

Individuals who are not employees of the Company or one of its parent or subsidiary corporations may not be granted Incentive Stock Options.

### 8.3     Exercise Price

Incentive Stock Options shall be granted with an exercise price per share not less than 100% of the Fair Market Value of the Common Stock on the Grant Date, and in the case of an Incentive Stock Option granted to a Participant who owns more than 10% of the total combined voting power of all classes of the stock of the Company or of its parent or subsidiary corporations (a "*Ten Percent Stockholder*"), shall be granted with an exercise price per share not less than 110% of the Fair Market Value of the Common Stock on the Grant Date.  The determination of more than 10% ownership shall be made in accordance with Section 422 of the Code.

### 8.4     Option Term

Subject to earlier termination in accordance with the terms of the Plan and the instrument evidencing the Option, the maximum term of an Incentive Stock Option shall not exceed ten years, and in the case of an Incentive Stock Option granted to a Ten Percent Stockholder, shall not exceed five years.

81571-0001/LEGAL23780120.3

**8.5    Exercisability**

An Option designated as an Incentive Stock Option shall cease to qualify for favorable tax treatment as an Incentive Stock Option to the extent it is exercised (if permitted by the terms of the Option) (a) more than three months after the date of a Participant's termination of employment if termination was for reasons other than death or disability, (b) more than one year after the date of a Participant's termination of employment if termination was by reason of disability, or (c) more than six months following the first day of a Participant's leave of absence that exceeds three months, unless the Participant's reemployment rights are guaranteed by statute or contract.

**8.6    Taxation of Incentive Stock Options**

In order to obtain certain tax benefits afforded to Incentive Stock Options under Section 422 of the Code, the Participant must hold the shares acquired upon the exercise of an Incentive Stock Option for two years after the Grant Date and one year after the date of exercise.

A Participant may be subject to the alternative minimum tax at the time of exercise of an Incentive Stock Option. The Participant shall give the Company prompt notice of any disposition of shares acquired on the exercise of an Incentive Stock Option prior to the expiration of such holding periods.

**8.7    Code Definitions**

For the purposes of this Section 8, "disability," "parent corporation" and "subsidiary corporation" shall have the meanings attributed to those terms for purposes of Section 422 of the Code.

**8.8    Promissory Notes**

The amount of any promissory note delivered pursuant to Section 7.5 in connection with an Incentive Stock Option shall bear interest at a rate specified by the Plan Administrator, but in no case less than the rate required to avoid imputation of interest (taking into account any exceptions to the imputed interest rules) for federal income tax purposes.

## SECTION 9. STOCK APPRECIATION RIGHTS

**9.1    Grant of Stock Appreciation Rights**

The Plan Administrator may grant Stock Appreciation Rights to Participants at any time on such terms and conditions as the Plan Administrator shall determine in its sole discretion. An SAR may be granted in tandem with an Option or alone ("*freestanding*"). The grant price of a tandem SAR shall be equal to the exercise price of the related Option. The grant price of a freestanding SAR shall be established in accordance with procedures for Options set forth in Section 7.2. An SAR may be exercised upon such terms and conditions and for the term as the Plan Administrator determines in its sole discretion; provided, however, that, subject to

81571-0001/LEGAL23780120.3

earlier termination in accordance with the terms of the Plan and the instrument evidencing the SAR, the maximum term of a freestanding SAR shall be ten years, and in the case of a tandem SAR, (a) the term shall not exceed the term of the related Option and (b) the tandem SAR may be exercised for all or part of the shares subject to the related Option upon the surrender of the right to exercise the equivalent portion of the related Option, except that the tandem SAR may be exercised only with respect to the shares for which its related Option is then exercisable.

## 9.2    Payment of SAR Amount

Upon the exercise of an SAR, a Participant shall be entitled to receive payment in an amount determined by multiplying: (a) the difference between the Fair Market Value of the Common Stock on the date of exercise over the grant price of the SAR by (b) the number of shares with respect to which the SAR is exercised. At the discretion of the Plan Administrator as set forth in the instrument evidencing the Award, the payment upon exercise of an SAR may be in cash, in shares, in some combination thereof or in any other manner approved by the Plan Administrator in its sole discretion.

## 9.3    Waiver of Restrictions

The Plan Administrator, in its sole discretion, may waive any other terms, conditions or restrictions on any SAR under such circumstances and subject to such terms and conditions as the Plan Administrator shall deem appropriate.

## SECTION 10.  STOCK AWARDS, RESTRICTED STOCK AND STOCK UNITS

### 10.1    Grant of Stock Awards, Restricted Stock and Stock Units

The Plan Administrator may grant Stock Awards, Restricted Stock and Stock Units on such terms and conditions and subject to such repurchase or forfeiture restrictions, if any, which may be based on continuous service with the Company or a Related Company or the achievement of any performance goals, as the Plan Administrator shall determine in its sole discretion, which terms, conditions and restrictions shall be set forth in the instrument evidencing the Award.

### 10.2    Vesting of Restricted Stock and Stock Units

Upon the satisfaction of any terms, conditions and restrictions prescribed with respect to Restricted Stock or Stock Units, or upon a Participant's release from any terms, conditions and restrictions of Restricted Stock or Stock Units, as determined by the Plan Administrator (a) the shares of Restricted Stock covered by each Award of Restricted Stock shall become freely transferable by the Participant subject to the terms and conditions of the Plan, the instrument evidencing the Award, and applicable securities laws, and (b) Stock Units shall be paid in shares of Common Stock or, if set forth in the instrument evidencing the Awards, in cash or a combination of cash and shares of Common Stock. Any fractional shares subject to such Awards shall be paid to the Participant in cash.

-9-

### 10.3   Waiver of Restrictions

The Plan Administrator, in its sole discretion, may waive the repurchase or forfeiture period and any other terms, conditions or restrictions on any Restricted Stock or Stock Unit under such circumstances and subject to such terms and conditions as the Plan Administrator shall deem appropriate.

## SECTION 11.  OTHER STOCK OR CASH-BASED AWARDS

Subject to the terms of the Plan and such other terms and conditions as the Plan Administrator deems appropriate, the Plan Administrator may grant other incentives payable in cash or in shares of Common Stock under the Plan.

## SECTION 12.  WITHHOLDING

The Company may require the Participant to pay to the Company the amount of (a) any taxes that the Company is required by applicable federal, state, local or foreign law to withhold with respect to the grant, vesting or exercise of an Award ("*tax withholding obligations*") and (b) any amounts due from the Participant to the Company or to any Related Company ("*other obligations*").  Notwithstanding any other provision of the Plan to the contrary, the Company shall not be required to issue any shares of Common Stock or otherwise settle an Award under the Plan until such tax withholding obligations and other obligations are satisfied.

The Plan Administrator may permit or require a Participant to satisfy all or part of the Participant's tax withholding obligations and other obligations by (a) paying cash to the Company, (b) having the Company withhold an amount from any cash amounts otherwise due or to become due from the Company to the Participant, (c) having the Company withhold a number of shares of Common Stock that would otherwise be issued to the Participant (or become vested, in the case of Restricted Stock) having a Fair Market Value equal to the tax withholding obligations and other obligations, or (d) surrendering a number of shares of Common Stock the Participant already owns having a value equal to the tax withholding obligations and other obligations.  The value of the shares so withheld or tendered may not exceed the employer's minimum required tax withholding rate.

## SECTION 13.  ASSIGNABILITY

No Award or interest in an Award may be sold, assigned, pledged (as collateral for a loan or as security for the performance of an obligation or for any other purpose) or transferred by a Participant or made subject to attachment or similar proceedings otherwise than by will or by the applicable laws of descent and distribution, except to the extent the Participant designates one or more beneficiaries on a Company-approved form who may exercise the Award or receive payment under the Award after the Participant's death.  During a Participant's lifetime, an Award may be exercised only by the Participant.  Notwithstanding the foregoing and to the extent permitted by Section 422 of the Code, the Plan Administrator, in its sole

discretion, may permit a Participant to assign or transfer an Award, subject to such terms and conditions as the Plan Administrator shall specify.

## SECTION 14. ADJUSTMENTS

### 14.1   Adjustment of Shares

In the event, at any time or from time to time, a stock dividend, stock split, spin-off, combination or exchange of shares, recapitalization, merger, consolidation, distribution to stockholders other than a normal cash dividend, or other change in the Company's corporate or capital structure results in (a) the outstanding shares of Common Stock, or any securities exchanged therefor or received in their place, being exchanged for a different number or kind of securities of the Company or any other company or (b) new, different or additional securities of the Company or any other company being received by the holders of shares of Common Stock, then the Plan Administrator shall make proportional adjustments in (i) the maximum number and kind of securities available for issuance under the Plan; (ii) the maximum number and kind of securities issuable as Incentive Stock Options as set forth in Section 4.2(d); and (iii) the number and kind of securities that are subject to any outstanding Award and the per share price of such securities, without any change in the aggregate price to be paid therefor. The determination by the Plan Administrator as to the terms of any of the foregoing adjustments shall be conclusive and binding.

Notwithstanding the foregoing, the issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, for cash or property, or for labor or services rendered, either upon direct sale or upon the exercise of rights or warrants to subscribe therefor, or upon conversion of shares or obligations of the Company convertible into such shares or other securities, shall not affect, and no adjustment by reason thereof shall be made with respect to, outstanding Awards. Also notwithstanding the foregoing, a dissolution or liquidation of the Company or a Change of Control shall not be governed by this Section 14.1 but shall be governed by Sections 14.2 and 14.3, respectively.

### 14.2   Dissolution or Liquidation

To the extent not previously exercised or settled, and unless otherwise determined by the Plan Administrator in its sole discretion, Awards shall terminate immediately prior to the dissolution or liquidation of the Company. To the extent a vesting condition, forfeiture provision or repurchase right applicable to an Award has not been waived by the Plan Administrator, the Award shall be forfeited immediately prior to the consummation of the dissolution or liquidation.

### 14.3   Change of Control

(a)      Notwithstanding any other provision of the Plan to the contrary, unless the Plan Administrator determines otherwise with respect to a particular Award in the instrument evidencing the Award or in a written employment, services or other agreement between the Participant and the Company or a Related Company, in the event of a Change of Control, if

and to the extent an outstanding Award is not converted, assumed, substituted for or replaced by the Successor Company, then effective immediately prior to the Change of Control such Award shall become fully vested and exercisable or payable, and all applicable restrictions or forfeiture provisions shall lapse, and then terminate upon effectiveness of the Change of Control. If and to the extent the Successor Company converts, assumes, substitutes for or replaces an outstanding Award, the vesting and/or exercisability restrictions and/or forfeiture and/or repurchase provisions applicable to such Award shall not be accelerated or lapse, and all such vesting and/or exercisability restrictions and/or forfeiture and/or repurchase provisions shall continue with respect to any shares of the Successor Company or other consideration that may be received with respect to such Award.

(b)      For the purposes of Section 14.3(a), an Award shall be considered converted, assumed, substituted for or replaced by the Successor Company if following the Change of Control the Award confers the right to purchase or receive, for each share of Common Stock subject to the Award immediately prior to the Change of Control, the consideration (whether stock, cash or other securities or property) received in the Change of Control by holders of Common Stock for each share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding shares); provided, however, that if such consideration received in the Change of Control is not solely common stock of the Successor Company, the Plan Administrator may, with the consent of the Successor Company, provide for the consideration to be received pursuant to the Award, for each share of Common Stock subject thereto, to be solely common stock of the Successor Company substantially equal in fair market value to the per share consideration received by holders of Common Stock in the Change of Control. The determination of such substantial equality of value of consideration shall be made by the Plan Administrator, and its determination shall be conclusive and binding.

(c)      Notwithstanding the foregoing, the Plan Administrator, in its sole discretion, may instead provide in the event of a Change of Control that a Participant's outstanding Awards shall terminate upon or immediately prior to such Change of Control and that each such Participant shall receive, in exchange therefor, a cash payment equal to the amount (if any) by which (i) the Acquisition Price multiplied by the number of shares of Common Stock subject to such outstanding Awards (either to the extent then vested and exercisable, or subject to restrictions and/or forfeiture provisions, or whether or not then vested and exercisable, or subject to restrictions and/or forfeiture provisions, as determined by the Plan Administrator in its sole discretion) exceeds (ii) if applicable, the respective aggregate exercise, grant or purchase price payable with respect to shares of Common Stock subject to such Awards.

(d)      For the avoidance of doubt, nothing in this Section 14.3 requires all Awards to be treated similarly.

-12-

**14.4    Further Adjustment of Awards**

Subject to Sections 14.2 and 14.3, the Plan Administrator shall have the discretion, exercisable at any time before a sale, merger, consolidation, reorganization, liquidation, dissolution or change of control of the Company, as defined by the Plan Administrator, to take such further action as it determines to be necessary or advisable with respect to Awards. Such authorized action may include (but shall not be limited to) establishing, amending or waiving the type, terms, conditions or duration of, or restrictions on, Awards so as to provide for earlier, later, extended or additional time for exercise, lifting restrictions and other modifications, and the Plan Administrator may take such actions with respect to all Participants, to certain categories of Participants or only to individual Participants. The Plan Administrator may take such action before or after granting Awards to which the action relates and before or after any public announcement with respect to such sale, merger, consolidation, reorganization, liquidation, dissolution or change of control that is the reason for such action.

**14.5    No Limitations**

The grant of Awards shall in no way affect the Company's right to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets.

**14.6    Fractional Shares**

In the event of any adjustment in the number of shares covered by any Award, each such Award shall cover only the number of full shares resulting from such adjustment.

**14.7    Section 409A**

Subject to Section 18.5, but notwithstanding any other provision of the Plan to the contrary, (a) any adjustments made pursuant to this Section 14 to Awards that are considered "deferred compensation" within the meaning of Section 409A shall be made in compliance with the requirements of Section 409A and (b) any adjustments made pursuant to this Section 14 to Awards that are not considered "deferred compensation" subject to Section 409A shall be made in such a manner as to ensure that after such adjustment the Awards either (i) continue not to be subject to Section 409A or (ii) comply with the requirements of Section 409A.

## SECTION 15. FIRST REFUSAL RIGHTS; VOTING RESTRICTIONS

**15.1    First Refusal Rights**

Until the date on which the initial registration of the Common Stock under Section 12(b) or 12(g) of the Exchange Act first becomes effective, the Company shall have the right of first refusal with respect to any proposed sale or other disposition by a Participant of any shares of Common Stock issued pursuant to an Award. Such right of first refusal shall be exercisable in accordance with the terms and conditions established by the Plan Administrator and set

81571-0001/LEGAL23780120.3

forth in the agreement evidencing the Participant's receipt of the shares or, if applicable, in a shareholders agreement or other similar agreement.

### 15.2   Other Rights and Voting Restrictions

Until the date on which the initial registration of the Common Stock under Section 12(b) or 12(g) of the Exchange Act first becomes effective, the Plan Administrator may require a Participant, as a condition to receiving shares under the Plan, to become a party to a stock purchase agreement and/or a shareholders agreement or other similar agreement, in the form designated by the Plan Administrator, pursuant to which Participant grants to the Company and/or its other stockholders certain rights, including but not limited to co-sale rights, and agrees to certain voting restrictions with respect to the Shares acquired by Participant under the Plan.

### 15.3   General

The Company's rights under this Section 15 are assignable by the Company at any time.

## SECTION 16.  MARKET STANDOFF

In the event of an underwritten public offering by the Company of its equity securities pursuant to an effective registration statement filed under the Securities Act, including the Company's initial public offering, no person may sell, make any short sale of, loan, hypothecate, pledge, grant any option for the purchase of, or otherwise dispose of or transfer for value or otherwise agree to engage in any of the foregoing transactions with respect to any shares issued pursuant to an Award granted under the Plan without the prior written consent of the Company or its underwriters.  Such limitations shall be in effect for such period of time as may be requested by the Company or such underwriters; provided, however, that in no event shall such period exceed (a) 180 days after the effective date of the registration statement for such public offering or (b) such longer period requested by the underwriters as is necessary to comply with regulatory restrictions on the publication of research reports (including, but not limited to, NYSE Rule 472 or NASD Conduct Rule 2711, or any successor rules).  The limitations of this Section 16 shall in all events terminate two years after the effective date of the Company's initial public offering.

In the event of any stock split, stock dividend, recapitalization, combination of shares, exchange of shares or other change affecting the Company's outstanding Common Stock effected as a class without the Company's receipt of consideration, any new, substituted or additional securities distributed with respect to the shares issued under the Plan shall be immediately subject to the provisions of this Section 16, to the same extent the shares issued under the Plan are at such time covered by such provisions.

In order to enforce the limitations of this Section 16, the Company may impose stop-transfer instructions with respect to the shares until the end of the applicable standoff period.

-14-

## SECTION 17.  AMENDMENT AND TERMINATION

### 17.1    Amendment, Suspension or Termination

The Board may amend, suspend or terminate the Plan or any portion of the Plan at any time and in such respects as it shall deem advisable; provided, however, that, to the extent required by applicable law, regulation or stock exchange rule, stockholder approval shall be required for any amendment to the Plan.  Subject to Section 17.3, the Board may amend the terms of any outstanding Award, prospectively or retroactively.

### 17.2    Term of the Plan

The Plan shall have no fixed expiration date.  After the Plan is terminated, no future Awards may be granted, but Awards previously granted shall remain outstanding in accordance with their applicable terms and conditions and the Plan's terms and conditions.  Notwithstanding the foregoing, no Incentive Stock Options may be granted more than ten years after the later of (a) the adoption of the Plan by the Board and (b) the adoption by the Board of any amendment to the Plan that constitutes the adoption of a new plan for purposes of Section 422 of the Code.

### 17.3    Consent of Participant

The amendment, suspension or termination of the Plan or a portion thereof or the amendment of an outstanding Award shall not, without the Participant's consent, materially adversely affect any rights under any Award theretofore granted to the Participant under the Plan.  Any change or adjustment to an outstanding Incentive Stock Option shall not, without the consent of the Participant, be made in a manner so as to constitute a "modification" that would cause such Incentive Stock Option to fail to continue to qualify as an Incentive Stock Option.  Notwithstanding the foregoing, any adjustments made pursuant to Section 14 shall not be subject to these restrictions.

Subject to Section 18.5, but notwithstanding any other provision of the Plan to the contrary, the Board shall have broad authority to amend the Plan or any outstanding Award without the consent of the Participant to the extent the Board deems necessary or advisable to comply with, or take into account, changes in applicable tax laws, securities laws, accounting rules or other applicable law, rule or regulation.

## SECTION 18.  GENERAL

### 18.1    No Individual Rights

No individual or Participant shall have any claim to be granted any Award under the Plan, and the Company has no obligation for uniformity of treatment of Participants under the Plan.

Furthermore, nothing in the Plan or any Award granted under the Plan shall be deemed to constitute an employment contract or confer or be deemed to confer on any Participant any right to continue in the employ of, or to continue any other relationship with, the Company or any Related Company or limit in any way the right of the Company or any Related Company to terminate a Participant's employment or other relationship at any time, with or without cause.

## 18.2   Issuance of Shares

Notwithstanding any other provision of the Plan to the contrary, the Company shall have no obligation to issue or deliver any shares of Common Stock under the Plan or make any other distribution of benefits under the Plan unless, in the opinion of the Company's counsel, such issuance, delivery or distribution would comply with all applicable laws (including, without limitation, the requirements of the Securities Act or the laws of any state or foreign jurisdiction) and the applicable requirements of any securities exchange or similar entity.

The Company shall be under no obligation to any Participant to register for offering or resale or to qualify for exemption under the Securities Act, or to register or qualify under the laws of any state or foreign jurisdiction, any shares of Common Stock, security or interest in a security paid or issued under, or created by, the Plan, or to continue in effect any such registrations or qualifications if made.

As a condition to the exercise of an Option or any other receipt of Common Stock pursuant to an Award under the Plan, the Company may require (a) the Participant to represent and warrant at the time of any such exercise or receipt that such shares are being purchased or received only for the Participant's own account and without any present intention to sell or distribute such shares and (b) such other action or agreement by the Participant as may from time to time be necessary to comply with the federal, state and foreign securities laws. At the option of the Company, a stop-transfer order against any such shares may be placed on the official stock books and records of the Company, and a legend indicating that such shares may not be pledged, sold or otherwise transferred, unless an opinion of counsel is provided (concurred in by counsel for the Company) stating that such transfer is not in violation of any applicable law or regulation, may be stamped on stock certificates to ensure exemption from registration. The Plan Administrator may also require the Participant to execute and deliver to the Company a purchase agreement or such other agreement as may be in use by the Company at such time that describes certain terms and conditions applicable to the shares.

To the extent the Plan or any instrument evidencing an Award provides for issuance of stock certificates to reflect the issuance of shares of Common Stock, the issuance may be effected on a noncertificated basis, to the extent not prohibited by applicable law or the applicable rules of any stock exchange.

## 18.3   Indemnification

Each person who is or shall have been a member of the Board shall be indemnified and held harmless by the Company against and from any loss, cost, liability or expense that may be

imposed upon or reasonably incurred by such person in connection with or resulting from any claim, action, suit or proceeding to which such person may be a party or in which such person may be involved by reason of any action taken or failure to act under the Plan and against and from any and all amounts paid by such person in settlement thereof, with the Company's approval, or paid by such person in satisfaction of any judgment in any such claim, action, suit or proceeding against such person, unless such loss, cost, liability or expense is a result of such person's own willful misconduct or except as expressly provided by statute; provided, however, that such person shall give the Company an opportunity, at its own expense, to handle and defend the same before such person undertakes to handle and defend it on such person's own behalf.

The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such person may be entitled under the Company's certificate of incorporation or bylaws, as a matter of law, or otherwise, or of any power that the Company may have to indemnify or hold harmless.

### 18.4    No Rights as a Stockholder

Unless otherwise provided by the Plan Administrator or in the instrument evidencing the Award or in a written employment, services or other agreement, no Award, other than a Stock Award, shall entitle the Participant to any cash dividend, voting or other right of a stockholder unless and until the date of issuance under the Plan of the shares that are the subject of such Award.

### 18.5    Compliance with Laws and Regulations

In interpreting and applying the provisions of the Plan, any Option granted as an Incentive Stock Option pursuant to the Plan shall, to the extent permitted by law, be construed as an "incentive stock option" within the meaning of Section 422 of the Code.

The Plan and Awards granted under the Plan are intended to be exempt from the requirements of Section 409A to the maximum extent possible, whether pursuant to the short-term deferral exception described in Treasury Regulation Section 1.409A-1(b)(4), the exclusion applicable to stock options, stock appreciation rights and certain other equity-based compensation under Treasury Regulation Section 1.409A-1(b)(5), or otherwise. To the extent Section 409A is applicable to the Plan or any Award granted under the Plan, it is intended that the Plan and any Awards granted under the Plan comply with the deferral, payout, plan termination and other limitations and restrictions imposed under Section 409A. Notwithstanding any other provision of the Plan or any Award granted under the Plan to the contrary, the Plan and any Award granted under the Plan shall be interpreted, operated and administered in a manner consistent with such intentions; provided, however, that the Plan Administrator makes no representations that Awards granted under the Plan shall be exempt from or comply with Section 409A and makes no undertaking to preclude Section 409A from applying to Awards granted under the Plan. Without limiting the generality of the foregoing, and notwithstanding any other provision of the Plan or any Award granted under the Plan to

the contrary, with respect to any payments and benefits under the Plan or any Award granted under the Plan to which Section 409A applies, all references in the Plan or any Award granted under the Plan to the termination of the Participant's employment or service are intended to mean the Participant's "separation from service," within the meaning of Section 409A(a)(2)(A)(i) to the extent necessary to avoid subjecting the Participant to the imposition of any additional tax under Section 409A. In addition, if the Participant is a "specified employee," within the meaning of Section 409A, then to the extent necessary to avoid subjecting the Participant to the imposition of any additional tax under Section 409A, amounts that would otherwise be payable under the Plan or any Award granted under the Plan during the six-month period immediately following the Participant's "separation from service," within the meaning of Section 409A(a)(2)(A)(i), shall not be paid to the Participant during such period, but shall instead be accumulated and paid to the Participant (or, in the event of the Participant's death, the Participant's estate) in a lump sum on the first business day after the earlier of the date that is six months following the Participant's separation from service or the Participant's death. Notwithstanding any other provision of the Plan to the contrary, the Plan Administrator, to the extent it deems necessary or advisable in its sole discretion, reserves the right, but shall not be required, to unilaterally amend or modify the Plan and any Award granted under the Plan so that the Award qualifies for exemption from or complies with Section 409A.

### 18.6    Participants in Other Countries or Jurisdictions

Without amending the Plan, the Plan Administrator may grant Awards to Eligible Persons who are foreign nationals on such terms and conditions different from those specified in the Plan, as may, in the judgment of the Plan Administrator, be necessary or desirable to foster and promote achievement of the purposes of the Plan and shall have the authority to adopt such modifications, procedures, subplans and the like as may be necessary or desirable to comply with provisions of the laws or regulations of other countries or jurisdictions in which the Company or any Related Company may operate or have employees to ensure the viability of the benefits from Awards granted to Participants employed in such countries or jurisdictions, meet the requirements that permit the Plan to operate in a qualified or tax efficient manner, comply with applicable foreign laws or regulations and meet the objectives of the Plan.

### 18.7    No Trust or Fund

The Plan is intended to constitute an "unfunded" plan. Nothing contained herein shall require the Company to segregate any monies or other property, or shares of Common Stock, or to create any trusts, or to make any special deposits for any immediate or deferred amounts payable to any Participant, and no Participant shall have any rights that are greater than those of a general unsecured creditor of the Company.

**18.8   Successors**

All obligations of the Company under the Plan with respect to Awards shall be binding on any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all the business and/or assets of the Company.

**18.9   Severability**

If any provision of the Plan or any Award is determined to be invalid, illegal or unenforceable in any jurisdiction, or as to any person, or would disqualify the Plan or any Award under any law deemed applicable by the Plan Administrator, such provision shall be construed or deemed amended to conform to applicable laws, or, if it cannot be so construed or deemed amended without, in the Plan Administrator's determination, materially altering the intent of the Plan or the Award, such provision shall be stricken as to such jurisdiction, person or Award, and the remainder of the Plan and any such Award shall remain in full force and effect.

**18.10   Choice of Law and Venue**

The Plan, all Awards granted thereunder and all determinations made and actions taken pursuant hereto, to the extent not otherwise governed by the laws of the United States, shall be governed by the laws of the State of Florida without giving effect to principles of conflicts of law.  Participants irrevocably consent to the nonexclusive jurisdiction and venue of the state and federal courts located in the State of Florida.

**18.11   Legal Requirements**

The granting of Awards and the issuance of shares of Common Stock under the Plan are subject to all applicable laws, rules and regulations, and to such approvals by any governmental agencies or national securities exchanges as may be required.

**18.12   California Appendix Provisions**

To the extent required by applicable law, Participants who are residents of the State of California shall be subject to the additional terms and conditions set forth in Appendix B to the Plan until such time as the Common Stock becomes a "listed" security under the Securities Act.

## SECTION 19.  EFFECTIVE DATE

The effective date (the "*Effective Date*") is the date on which the Plan is adopted by the Board.  If the stockholders of the Company do not approve the Plan within 12 months after the Board's adoption of the Plan, any Incentive Stock Options granted under the Plan will be treated as Nonqualified Stock Options.

-19-

# APPENDIX A

## DEFINITIONS

As used in the Plan,

"*Acquired Entity*" means any entity acquired by the Company or a Related Company or with which the Company or a Related Company merges or combines.

"*Acquisition Price*" means the fair market value of the securities, cash or other property, or any combination thereof, receivable or deemed receivable upon a Change of Control in respect of a share of Common Stock, as determined by the Plan Administrator in its sole discretion.

"*Award*" means any Option, Stock Appreciation Right, Stock Award, Restricted Stock, Stock Unit or cash-based award or other incentive payable in cash or in shares of Common Stock, as may be designated by the Plan Administrator from time to time.

"*Board*" means the Board of Directors of the Company.

"*Cause*," unless otherwise defined in the instrument evidencing an Award or in a written employment, services or other agreement between the Participant and the Company or a Related Company, means dishonesty, fraud, serious or willful misconduct, unauthorized use or disclosure of confidential information or trade secrets, or conduct prohibited by law (except minor violations), in each case as determined by the Company's chief human resources officer or other person performing that function or, in the case of directors and executive officers, the Board, whose determination shall be conclusive and binding.

"*Change of Control*," unless the Plan Administrator determines otherwise with respect to an Award at the time the Award is granted or unless otherwise defined for purposes of an Award in a written employment, services or other agreement between the Participant and the Company or a Related Company, means consummation of:

(a)      a merger or consolidation of the Company with or into any other company or other entity;

(b)      a sale, in one transaction or a series of transactions undertaken with a common purpose, of all of the Company's outstanding voting securities; or

(c)      a sale, lease, exchange or other transfer, in one transaction or a series of related transactions, undertaken with a common purpose of all or substantially all of the Company's assets.

Notwithstanding the foregoing, a Change of Control shall not include (i) a merger or consolidation of the Company in which the holders of the outstanding voting securities of the

A-1

Company immediately prior to the merger or consolidation hold at least a majority of the outstanding voting securities of the Successor Company immediately after the merger or consolidation; (ii) a sale, lease, exchange or other transfer of all or substantially all of the Company's assets to a majority-owned subsidiary company; (iii) a transaction undertaken for the principal purpose of restructuring the capital of the Company, including, but not limited to, reincorporating the Company in a different jurisdiction, converting the Company to a limited liability company or creating a holding company; or (iv) any transaction that the Board determines is not a Change of Control for purposes of the Plan.

Where a series of transactions undertaken with a common purpose is deemed to be a Change of Control, the date of such Change of Control shall be the date on which the last of such transactions is consummated.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time.

"*Common Stock*" means the common stock, par value $0.001 per share, of the Company.

"*Company*" means Magic Leap, Inc., a Delaware corporation.

"*Disability*," unless otherwise defined by the Plan Administrator for purposes of the Plan or in the instrument evidencing an Award or in a written employment, services or other agreement between the Participant and the Company or a Related Company, means a mental or physical impairment of the Participant that is expected to result in death or that has lasted or is expected to last for a continuous period of 12 months or more and that causes the Participant to be unable to perform his or her material duties for the Company or a Related Company and to be engaged in any substantial gainful activity, in each case as determined by the Company's chief human resources officer or other person performing that function or, in the case of directors and executive officers, the Board, each of whose determination shall be conclusive and binding.

"*Effective Date*" has the meaning set forth in Section 19.

"*Eligible Person*" means any person eligible to receive an Award as set forth in Section 5.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended from time to time.

"*Fair Market Value*" means the per share fair market value of the Common Stock as established in good faith by the Plan Administrator or, if the Common Stock is publicly traded, the closing price for the Common Stock on any given date during regular trading, or if not trading on that date, such price on the last preceding date on which the Common Stock was traded, unless determined otherwise by the Plan Administrator using such methods or procedures as it may establish.

"*Grant Date*" means the later of (a) the date on which the Plan Administrator completes the corporate action authorizing the grant of an Award or such later date specified by the Plan Administrator and (b) the date on which all conditions precedent to an Award have been

A-2

satisfied, provided that conditions to the exercisability or vesting of Awards shall not defer the Grant Date.

"*Incentive Stock Option*" means an Option granted with the intention that it qualify as an "incentive stock option" as that term is defined for purposes of Section 422 of the Code or any successor provision.

"*Nonqualified Stock Option*" means an Option other than an Incentive Stock Option.

"*Option*" means a right to purchase Common Stock granted under Section 7.

"*Option Expiration Date*" means the last day of the maximum term of an Option.

"*Option Term*" means the maximum term of an Option as set forth in Section 7.3.

"*Participant*" means any Eligible Person to whom an Award is granted.

"*Plan*" means the Magic Leap, Inc. 2012 Equity Incentive Plan.

"*Plan Administrator*" has the meaning set forth in Section 3.1.

"*Related Company*" means any entity that, directly or indirectly, is in control of, is controlled by or is under common control with the Company.

"*Restricted Stock*" means an Award of shares of Common Stock granted under Section 10, the rights of ownership of which are subject to restrictions prescribed by the Plan Administrator.

"*Retirement*," unless otherwise defined in the instrument evidencing the Award or in a written employment, services or other agreement between the Participant and the Company or a Related Company, means "Retirement" as defined for purposes of the Plan by the Plan Administrator or the Company's chief human resources officer or other person performing that function or, if not so defined, means Termination of Service on or after the date the Participant reaches "normal retirement age," as that term is defined in Section 411(a)(8) of the Code.

"*Section 409A*" means Section 409A of the Code.

"*Securities Act*" means the Securities Act of 1933, as amended from time to time.

"*Stock Appreciation Right*" or "*SAR*" means a right granted under Section 9.1 to receive the excess of the Fair Market Value of a specified number of shares of Common Stock over the grant price.

"*Stock Award*" means an Award of shares of Common Stock granted under Section 10, the rights of ownership of which are not subject to restrictions prescribed by the Plan Administrator.

"*Stock Unit*" means an Award denominated in units of Common Stock granted under Section 10.

"*Substitute Awards*" means Awards granted or shares of Common Stock issued by the Company in substitution or exchange for awards previously granted by an Acquired Entity.

"*Successor Company*" means the surviving company, the successor company, the acquiring company or its parent, as applicable, in connection with a Change of Control.

"*Termination of Service*" means a termination of employment or service relationship with the Company or a Related Company for any reason, whether voluntary or involuntary, including by reason of death, Disability or Retirement. Any question as to whether and when there has been a Termination of Service for the purposes of an Award and the cause of such Termination of Service shall be determined by the Company's chief human resources officer or other person performing that function or, with respect to directors and executive officers, by the Board, whose determination shall be conclusive and binding. Transfer of a Participant's employment or service relationship between the Company and any Related Company shall not be considered a Termination of Service for purposes of an Award. Unless the Board determines otherwise, a Termination of Service shall be deemed to occur if the Participant's employment or service relationship is with an entity that has ceased to be a Related Company. A Participant's change in status from an employee of the Company or a Related Company to a nonemployee director, consultant, advisor or independent contractor of the Company or a Related Company, or a change in status from a nonemployee director, consultant, advisor or independent contractor of the Company or a Related Company to an employee of the Company or a Related Company, shall not be considered a Termination of Service.

"*Vesting Commencement Date*" means the Grant Date or such other date selected by the Plan Administrator as the date from which an Award begins to vest.

A-4

## APPENDIX B

## TO THE MAGIC LEAP, INC.
## 2012 EQUITY INCENTIVE PLAN

(For California Residents Only)

This Appendix to the Magic Leap, Inc. 2012 Equity Incentive Plan (the "*Plan*") shall have application only to Participants who are residents of the State of California. Capitalized terms contained herein shall have the same meanings given to them in the Plan, unless otherwise provided in this Appendix. **Notwithstanding any other provision of the Plan to the contrary and to the extent required by applicable law, the following terms and conditions shall apply to all Awards granted to residents of the State of California, until such time as the Common Stock becomes a "listed security" under the Securities Act:**

1.      Options shall have a term of not more than ten years from the Grant Date.

2.      Awards shall be nontransferable other than by will or the laws of descent and distribution. Notwithstanding the foregoing, and to the extent permitted by Section 422 of the Code, the Plan Administrator, in its discretion, may permit transfer of an Award to a revocable trust or as otherwise permitted by Rule 701 of the Securities Act.

3.      Unless employment or services are terminated for Cause, the right to exercise an Option in the event of Termination of Service, to the extent that the Participant is otherwise entitled to exercise an Option on the date of Termination of Service, shall be

      (a)      at least six months from the date of a Participant's Termination of Service if termination was caused by death or Disability; and

      (b)      at least 30 days from the date of a Participant's Termination of Service if termination of employment was caused by other than death or Disability;

      (c)      but in no event later than the Option Expiration Date.

4.      No Award may be granted to a resident of California more than ten years after the earlier of the date of adoption of the Plan and the date the Plan is approved by the stockholders.

5.      Stockholders of the Company must approve the Plan by the later of (a) within 12 months before or after the Plan is adopted by the Board and (b) (i) with respect to Options, prior to or within 12 months of the grant of an Option under the Plan to a resident of the State of California, and (ii) with respect to Awards other than Options, prior to the issuance of such Award to a resident of the State of California. Any Option exercised by a California resident or shares issued under an Award to a California resident shall be

rescinded if stockholder approval is not obtained in the foregoing manner.  Shares subject to such Awards shall not be counted in determining whether such approval is obtained.

6.       To the extent required by applicable law, the Company shall provide annual financial statements of the Company to each California resident holding an outstanding Award under the Plan.  Such financial statements need not be audited and need not be issued to key persons whose duties at the Company assure them access to equivalent information.

81571-0001/LEGAL23780120.3

## PLAN ADOPTION AND AMENDMENTS/ADJUSTMENTS
## SUMMARY PAGE

| Date of Board Action | Action | Section/Effect of Amendment | Date of Stockholder Approval |
|---|---|---|---|
| June 8, 2012 | Initial Plan Adoption | Section 4.1 | June 8, 2012 |
| July 13, 2012 | Plan Increase by 3,239,298 | Section 4.1 | July 13, 2012 |
| January 18, 2014 | Plan Increase by 12,900,000 | Section 4.1 | January 18, 2014 |
| October 9, 2014 | Plan Increase by 11,318,000 | Section 4.1 | October 10, 2014 |

B-3

CM-010

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>Jack Russo, Esq. (SBN 96068)<br>Christopher Sargent, Esq. (SBN 246285)<br>Entrepreneur Law Group<br>401 Florence Street, Palo Alto, CA 94301<br>TELEPHONE NO.: (650) 327-9800    FAX NO.: (650) 618-1863<br>ATTORNEY FOR *(Name):* Gary Bradski and Adrian Kaehler | **FOR COURT USE ONLY**<br><br>ENDORSED<br>FILED<br><br>MAY 23 2016<br><br>David H. Yamasaki, Clerk of the Superior Court<br>County of Santa Clara, California<br>By_____<br>Deputy Clerk |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Santa Clara
STREET ADDRESS: 191 N. First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME: Downtown Superior Court

**CASE NAME:**
Gary Bradski and Adrian Kaehler v. Magic Leap, Inc. and Does 1-25

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | **CASE NUMBER:** 16CV295461 |
|---|---|---|
| ☑ Unlimited   ☐ Limited<br>(Amount          (Amount<br>demanded        demanded is<br>exceeds $25,000)  $25,000 or less) | ☐ Counter   ☐ Joinder<br><br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br><br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☑ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (*not specified above*) (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (*not specified above*) (43)

2. This case ☐ is ☑ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties       d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel    e. ☐ Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve                in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence         f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☐ monetary  b. ☑ nonmonetary; declaratory or injunctive relief  c. ☐ punitive
4. Number of causes of action *(specify):* One
5. This case ☐ is ☑ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: May 23, 2016

Jack Russo, Esq.
_____        ▶ _____
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
　Asbestos Property Damage
　Asbestos Personal Injury/ Wrongful Death
Product Liability (*not asbestos or toxic/environmental*) (24)
Medical Malpractice (45)
　Medical Malpractice– Physicians & Surgeons
　Other Professional Health Care Malpractice
Other PI/PD/WD (23)
　Premises Liability (e.g., slip and fall)
　Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
　Intentional Infliction of Emotional Distress
　Negligent Infliction of Emotional Distress
　Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) (*not civil harassment*) (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
　Legal Malpractice
　Other Professional Malpractice (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
　Breach of Rental/Lease Contract (*not unlawful detainer or wrongful eviction*)
　Contract/Warranty Breach–Seller Plaintiff (*not fraud or negligence*)
　Negligent Breach of Contract/ Warranty
　Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
　Collection Case–Seller Plaintiff
　Other Promissory Note/Collections Case
Insurance Coverage (*not provisionally complex*) (18)
　Auto Subrogation
　Other Coverage
Other Contract (37)
　Contractual Fraud
　Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
　Writ of Possession of Real Property
　Mortgage Foreclosure
　Quiet Title
　Other Real Property (*not eminent domain, landlord/tenant, or foreclosure*)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential*)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
　Writ–Administrative Mandamus
　Writ–Mandamus on Limited Court Case Matter
　Writ–Other Limited Court Case Review
Other Judicial Review (39)
　Review of Health Officer Order
　Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims (*arising from provisionally complex case type listed above*) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
　Abstract of Judgment (Out of County)
　Confession of Judgment (*non-domestic relations*)
　Sister State Judgment
　Administrative Agency Award (*not unpaid taxes*)
　Petition/Certification of Entry of Judgment on Unpaid Taxes
　Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified above*) (42)
　Declaratory Relief Only
　Injunctive Relief Only (*non-harassment*)
　Mechanics Lien
　Other Commercial Complaint Case (*non-tort/non-complex*)
　Other Civil Complaint (*non-tort/non-complex*)

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition (*not specified above*) (43)
　Civil Harassment
　Workplace Violence
　Elder/Dependent Adult Abuse
　Election Contest
　Petition for Name Change
　Petition for Relief From Late Claim
　Other Civil Petition

CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Page 2 of 2

# SANTA CLARA COUNTY SUPERIOR COURT
## ALTERNATIVE DISPUTE RESOLUTION
### INFORMATION SHEET

Many cases can be resolved to the satisfaction of all parties without the necessity of traditional litigation, which can be expensive, time consuming, and stressful. The Court finds that it is in the best interests of the parties that they participate in alternatives to traditional litigation, including arbitration, mediation, neutral evaluation, special masters and referees, and settlement conferences. Therefore, all matters shall be referred to an appropriate form of Alternative Dispute Resolution (ADR) before they are set for trial, unless there is good cause to dispense with the ADR requirement.

### *What is ADR?*
ADR is the general term for a wide variety of dispute resolution processes that are alternatives to litigation. Types of ADR processes include mediation, arbitration, neutral evaluation, special masters and referees, and settlement conferences, among others forms.

### *What are the advantages of choosing ADR instead of litigation?*
ADR can have a number of advantages over litigation:

- **ADR can save time.** A dispute can be resolved in a matter of months, or even weeks, while litigation can take years.

- **ADR can save money.** Attorney's fees, court costs, and expert fees can be reduced or avoided altogether.

- **ADR provides more participation.** Parties have more opportunities with ADR to express their interests and concerns, instead of focusing exclusively on legal rights.

- **ADR provides more control and flexibility.** Parties can choose the ADR process that is most likely to bring a satisfactory resolution to their dispute.

- **ADR can reduce stress.** ADR encourages cooperation and communication, while discouraging the adversarial atmosphere of litigation. Surveys of parties who have participated in an ADR process have found much greater satisfaction than with parties who have gone through litigation.

### *What are the main forms of ADR offered by the Court?*
 **Mediation** is an informal, confidential, flexible and non-binding process in the mediator helps the parties to understand the interests of everyone involved, and their practical and legal choices. The mediator helps the parties to communicate better, explore legal and practical settlement options, and reach an acceptable solution of the problem. The mediator does not decide the solution to the dispute; the parties do.

Mediation may be appropriate when:
- The parties want a non-adversary procedure
- The parties have a continuing business or personal relationship
- Communication problems are interfering with a resolution
- There is an emotional element involved
- The parties are interested in an injunction, consent decree, or other form of equitable relief

**Neutral evaluation**, sometimes called "Early Neutral Evaluation" or "ENE", is an informal process in which the evaluator, an experienced neutral lawyer, hears a compact presentation of both sides of the case, gives a non-binding assessment of the strengths and weaknesses on each side, and predicts the likely outcome. The evaluator can help parties to identify issues, prepare stipulations, and draft discovery plans. The parties may use the neutral's evaluation to discuss settlement.

Neutral evaluation may be appropriate when:
- The parties are far apart in their view of the law or value of the case
- The case involves a technical issue in which the evaluator has expertise
- Case planning assistance would be helpful and would save legal fees and costs
- The parties are interested in an injunction, consent decree, or other form of equitable relief

*-over-*

**Arbitration** is a less formal process than a trial, with no jury. The arbitrator hears the evidence and arguments of the parties and then makes a written decision. The parties can agree to binding or non-binding arbitration. In binding arbitration, the arbitrator's decision is final and completely resolves the case, without the opportunity for appeal. In non-binding arbitration, the arbitrator's decision could resolve the case, without the opportunity for appeal, unless a party timely rejects the arbitrator's decision within 30 days and requests a trial. Private arbitrators are allowed to charge for their time.

Arbitration may be appropriate when:

- The action is for personal injury, property damage, or breach of contract
- Only monetary damages are sought
- Witness testimony, under oath, needs to be evaluated
- An advisory opinion is sought from an experienced litigator (if a non-binding arbitration)

**Civil Judge ADR** allows parties to have a mediation or settlement conference with an experienced judge of the Superior Court. Mediation is an informal, confidential, flexible and non-binding process in which the judge helps the parties to understand the interests of everyone involved, and their practical and legal choices. A settlement conference is an informal process in which the judge meets with the parties or their attorneys, hears the facts of the dispute, helps identify issues to be resolved, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations. The request for mediation or settlement conference may be made promptly by stipulation (agreement) upon the filing of the Civil complaint and the answer. There is no charge for this service.

Civil Judge ADR may be appropriate when:

- The parties have complex facts to review
- The case involves multiple parties and problems
- The courthouse surroundings would he helpful to the settlement process

**Special masters and referees** are neutral parties who may be appointed by the court to obtain information or to make specific fact findings that may lead to a resolution of a dispute.
Special masters and referees can be particularly effective in complex cases with a number of parties, like construction disputes.

**Settlement conferences** are informal processes in which the neutral (a judge or an experienced attorney) meets with the parties or their attorneys, hears the facts of the dispute, helps identify issues to be resolved, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations.
Settlement conferences can be effective when the authority or expertise of the judge or experienced attorney may help the parties reach a resolution.

*What kind of disputes can be resolved by ADR?*
Although some disputes must go to court, almost any dispute can be resolved through ADR. This includes disputes involving business matters; civil rights; collections; corporations; construction; consumer protection; contracts; copyrights; defamation; disabilities; discrimination; employment; environmental problems; fraud; harassment; health care; housing; insurance; intellectual property; labor; landlord/tenant; media; medical malpractice and other professional negligence; neighborhood problems; partnerships; patents; personal injury; probate; product liability; property damage; real estate; securities; sports; trade secret; and wrongful death, among other matters.

*Where can you get assistance with selecting an appropriate form of ADR and a neutral for your case, information about ADR procedures, or answers to other questions about ADR?*

*Contact:*
Santa Clara County Superior Court
ADR Administrator
408-882-2530

Santa Clara County DRPA Coordinator
408-792-2784

**ATTACHMENT CV-5012**

## CIVIL LAWSUIT NOTICE
*Superior Court of California, County of Santa Clara*
*191 N. First St., San Jose, CA  95113*

CASE NUMBER: _____ 1 6 C V 2 9 6 4 8 1

## PLEASE READ THIS ENTIRE FORM

*PLAINTIFF* (the person suing):  Within 60 days after filing the lawsuit, you must serve each Defendant with the *Complaint, Summons,* an *Alternative Dispute Resolution (ADR) Information Sheet,* and a copy of this *Civil Lawsuit Notice,* and you must file written proof of such service.

---

*DEFENDANT* (The person sued):  **You must do each of the following to protect your rights:**

1. You must file a **written response** to the *Complaint, using the proper legal form or format,* in the Clerk's Office of the Court, within **30 days** of the date you were served with the *Summons and Complaint;*
2. You must serve by mail  a copy of your written response on the  Plaintiff's attorney or on the Plaintiff if Plaintiff has no attorney (to "serve by mail" means to have an adult other than yourself mail a copy); and
3. You must attend the first Case Management Conference.

**Warning:  If you, as the Defendant, do not follow these instructions,**
**you may automatically lose this case.**

---

*RULES AND FORMS:*  You must follow the California Rules of Court and the Superior Court of California, County of Santa Clara Local Civil Rules and use proper forms.  You can obtain legal information, view the rules and receive forms, free of charge, from the Self-Help Center at 99 Notre Dame Avenue, San Jose (408-882-2900 x-2926), www.scselfservice.org **(Select "Civil")** or from:

- State Rules and Judicial Council Forms:  www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms:  http://www.sccsuperiorcourt.org/civil/rule1toc.htm

*CASE MANAGEMENT CONFERENCE (CMC):*  You must meet with the other parties and discuss the case, in person or by telephone, at least 30 calendar days before the CMC.  You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC.

*You or your attorney must appear at the CMC.*  You may ask to appear by telephone – see *Local Civil Rule 8.*

---

*Your Case Management Judge is:* **Maureen Folan** _____ *Department:* ____ **8** ____

*The 1st CMC is scheduled for:* (Completed by Clerk of Court)
        *Date:* _____ **SEP 2 0 2016** _____ *Time:* **3:30pm** _ in Department: **8** _____

*The next CMC is scheduled for:* (Completed by party if the 1st CMC was continued or has passed)
        *Date:* _____ *Time:* _____ in **Department:** _____

---

*ALTERNATIVE DISPUTE RESOLUTION (ADR):*  If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

*WARNING:* Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

---