1  Jack Russo (Cal. Bar No. 96068)
   Christopher Sargent (Cal. Bar No. 246285)
2  COMPUTERLAW GROUP LLP
   401 Florence Street
3  Palo Alto, CA 94301
   (650) 327-9800 office
4  (650) 618-1863 fax
   jrusso@computerlaw.com
5  csargent@computerlaw.com

6  Attorneys for Plaintiffs
   GARY BRADSKI AND ADRIAN KAEHLER
7

8                 IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11
   GARY BRADSKI, an individual, and ADRIAN
12  KAEHLER, an individual,                    Case No. 5:16-cv-03235-NC

13                          Plaintiff,          AMENDED COMPLAINT FOR:

14          v.                                  (1)  WRONGFUL TERMINATION IN
                                                     VIOLATION OF PUBLIC POLICY IN
15  MAGIC LEAP, INC., a Delaware corporation,        CALIFORNIA LABOR CODE § 2870
                                                (2)  WRONGFUL TERMINATION IN
16                          Defendant.               VIOLATION OF PUBLIC POLICY IN
                                                     CALIFORNIA BUSINESS &
17                                                   PROFESSIONS CODE § 16600
                                                (3)  WRONGFUL TERMINATION IN
18                                                   VIOLATION OF PUBLIC POLICY IN
                                                     CALIFORNIA LABOR CODE § 200–
19                                                   203
                                                (4)  WRONGFUL TERMINATION IN
20                                                   VIOLATION OF PUBLIC POLICY IN
                                                     CALIFORNIA LABOR CODE § 221
21                                              (5)  LABOR CODE VIOLATIONS
                                                (6)  CONVERSION
22                                              (7)  BREACH OF CONTRACT – STOCK
                                                     OPTION PLAN
23                                              (8)  BREACH OF CONTRACT –
                                                     EMPLOYMENT AGREEMENTS
24                                              (9)  FRAUD
                                                (10) NEGLIGENT MISREPRESENTATION
25                                              (11) UNFAIR COMPETITION – UNLAWFUL
                                                     ACTS
26                                              (12) DECLARATORY RELIEF
                                                (13) UNJUST ENRICHMENT
27
                                                         Jury Trial Demanded.
28

Computerlaw Group LLP
www.computerlaw.com℠

1   Plaintiffs Gary Bradski and Adrian Kaehler (together, "Plaintiffs"), and each of them,

2   alleges against Defendant Magic Leap, Inc. ("Magic Leap" or "Defendant") as follows:

3   **NATURE OF ACTION**

4   1.   This is a complaint for damages, penalties, injunctive, declaratory relief, and other

5   relief for wrongful termination, California Labor Code violations, breach of contract, fraud,

6   negligent misrepresentation, unfair competition, and unjust enrichment arising from the wrongful

7   conduct of Defendant, against two California employees. Dr. Kaehler and Dr. Bradski were each

8   employed by Magic Leap under written employment agreements, and worked in its California

9   office in this County and District. Plaintiffs are experts in multiple fields, broadly categorized as

10   perception robotics, deep learning, and artificial intelligence. Each Plaintiff specifically

11   negotiated an express term in his employment agreement, a "consulting freedom" provision, Exs.

12   1 at p. 2, Ex. 2 at p. 2. Plaintiffs would not have joined Magic Leap without the protections of the

13   consulting freedom provision. Dr. Kaehler and Dr. Bradski each also earned compensation in the

14   form of incentive stock options under Magic Leap's plan. Dr. Kaehler and Dr. Bradski would not

15   have joined Magic Leap or accepted incentive stock option compensation if Defendant had

16   disclosed that it would require its employees to forfeit both vested and unvested stock options in

17   a summary and wrongful termination, based on unsupported allegations of wrongdoing without

18   any opportunity to discuss the basis for the allegations, or the basis for the purported termination.

19   Plaintiffs' preparations for post-Magic Leap projects drew on their respective expertise; on their

20   independent ideas which predated their joining Magic Leap; on work being published by third

21   parties with no connection to Magic Leap; and on their separate work, on their separate time, and

22   using their separate resources on projects that were and are noncompetitive to any work they

23   were doing for Magic Leap. On May 19, 2016, Magic Leap's general counsel, Mark Albert,

24   contacted counsel for Plaintiffs and accused Plaintiffs of breaching their Employment

25   Agreements in making preparations for their future employment after Magic Leap. Defendant

26   claimed this provided Defendant grounds for terminating Plaintiffs for cause. Defendant also

27   stated that Plaintiffs' vested and unvested stock options were forfeited. Defendant wrongfully

28

Computerlaw Group LLP
www.computerlaw.com℠

1  claimed that these preparations were the basis for Defendant terminating each Plaintiff "for

2  cause," effective May 20, 2016.

3                                  **PARTIES**

4       2.     Dr. Bradski is an individual residing in San Mateo County, California. He has a

5  Ph.D. in Cognitive and Neural Systems from Boston University, 1993. Prior to his termination,

6  Gary Bradski was the Vice President, Computer Vision and Software at Magic Leap, Inc. He did

7  not hold a Board position. He has decades of experience in the field of deep learning, computer

8  perception, artificial intelligence, and robotics, and was working on separate projects prior to and

9  while at Magic Leap on his own time, with his own equipment and funds.

10      3.     Dr. Kaehler is an individual residing in San Mateo County, California. He has

11 received his Ph.D. in Physics from Columbia University, 1997. Prior to his termination, Adrian

12 Kaehler was the Vice President, Technology and Solutions and Member of Technical Staff,

13 Computer Vision, then Vice President Core Software, later Vice President, Special Projects. He

14 did not hold a Board position. Adrian Kaehler has nearly two decades of work experience and

15 knowledge in the field of computing, mathematics, artificial intelligence, and robotics, and was

16 working on separate projects prior to and while at Magic Leap on his own time, with his own

17 equipment and funds.

18      4.     Magic Leap is a Delaware corporation, on information and belief, licensed to do

19 business in California, in this County and District, and at all relevant times, had an office in the

20 Silicon Valley at 2189 Leghorn Street, Mountain View, CA 94043 where it employs California

21 citizens as employees and independent contractors, including Plaintiffs, who were employed and

22 worked at and paid from Magic Leap's Santa Clara office in this County and District.

23                          **JURISDICTION AND VENUE**

24      5.     On May 23, 2016, Plaintiffs filed a declaratory relief lawsuit before the Superior

25 Court of Santa Clara to declare the parties' respective rights and obligations under the "right to

26 consult" provisions in their Employment Agreements with Magic Leap, under the incentive stock

27 option plan, and under applicable California law. Magic Leap removed to this Court. At all times,

28 Defendant operated a business in and did business in California, in this County and District. Its

Computerlaw Group LLP
www.computerlaw.com℠

1  wrongful acts and practices occurred while doing business in California, in this County and

2  District, and were directed at Plaintiffs and similarly situated employees in California, in this

3  County and District.

4  **GENERAL ALLEGATIONS**

5  6.  Gary Bradski entered into a written employment agreement with Magic Leap on

6  September 9, 2013 ("Bradski Agreement"). A true and correct redacted copy of the Bradski

7  Agreement is attached as **Exhibit 1**, and is incorporated by reference.

8  7.  Adrian Kaehler entered into a written employment agreement with Magic Leap on

9  November 1, 2013 ("Kaehler Agreement"). A true and correct redacted copy of the Kaehler

10  Agreement is attached as **Exhibit 2**, and is incorporated by reference.

11  8.  Each of the Kaehler and Bradski Agreements contain the following "Consulting

12  Provision:" " . . . nor will you engage in any other activities that conflict with your obligations to

13  the Company; provided, however, that you will be free to pursue ongoing consulting work

14  consistent with your past practice." Ex. 1, p.2; Ex. 2, p.2. Dr. Kaehler negotiated what became

15  this Consulting Provision with Magic Leap's CEO, Mr. Abovitz, in person in 2013, over lunch at

16  a lakefront restaurant in Florida. Dr. Kaehler relied on Mr. Abovitz's assurances at that 2013

17  lunch. Plaintiff relied upon Defendant's misrepresentations in negotiating and entering express

18  contractual term, and also relied upon Defendant's assurances that they each could earn

19  compensation in the form of stock options. Defendant concealed the true facts, which were that

20  they did not intend to honor this Consulting Provision or stock option compensation term in good

21  faith, and that they intended to constructively terminate Plaintiffs, then terminate them without

22  cause on spurious allegations of violations of a "non-compete," and in so doing, claim all

23  Plaintiffs' stock option earned compensation as forfeited. In making these misrepresentations and

24  concealing these true facts, Defendant intended to persuade each Plaintiff to:

25  (a)  forego other employment opportunities and to instead join Magic Leap;

26  (b)  put other projects on hold, including a potential new company in robotics;

27  and

28

Computerlaw Group LLP
www.computerlaw.com℠

Computerlaw Group LLP
www.computerlaw.com℠

  (c)  accept compensation in the form of stock options as opposed to ready money.

9.  Defendant intended Plaintiffs to rely upon Defendant's assurances and concealments. Plaintiffs did rely on Defendant's assurances and concealments, to their detriment, in deciding to:

  (a)  forego other employment opportunities;

  (b)  put other projects on hold, including a potential new company in robotics; and

  (c)  accept compensation in the form of stock options as opposed to ready money.

10.  The Magic Leap 2012 Equity Incentive Plan governs the stock options and stock grants of Dr. Bradski and Dr. Kaehler. A true and correct copy of the 2012 Equity Incentive Plan ("Stock Option Plan") is attached as **Exhibit 3**, and is incorporated by reference.

11.  Dr. Kaehler's title at Magic Leap was initially Vice President, Technology Solutions and Member of Technical Staff, Computer Vision. He was later Vice President Software, then was given the title Vice President Special Projects. Dr. Kaehler did not hold any managerial position. When Defendant gave him the title "VP Special Projects" in or around October 2014, it was a demotion. Dr. Kaehler was stripped of any reports, and his budget and role was curtailed. He had no supervisory or managerial role or duties. Ultimately, Defendant also eliminated any budget for Dr. Kaehler's "Special Projects."

12.  In October 2014, at the Florida vegetarian restaurant Sublime, Mr. Abovitz called Dr. Kaehler out to Florida for a one-on-one meeting. He assured Dr. Kaehler that Magic Leap had had "plenty of money" and that Plaintiff Kaehler could "write his own ticket," and asked Dr. Kaehler what he (Dr. Kaehler) wanted to do next at the Company. Dr. Kaehler pitched an idea in which Mr. Abovitz indicated an interest ("Special Project"). He "promoted" Dr. Kaehler to "Vice President of Special Projects," in charge of the effort developing that idea. Dr. Kaehler relied upon Defendant's misrepresentations that it would resource Dr. Kaehler's Special Project, and concealed the true facts, which were that Defendant would not give Dr. Kaehler human

1    resources, budget, or authority to do so. In fact, Defendant defunded the Special Project entirely

2    in 2016. Defendant intended Dr. Kaehler to rely upon Defendant's misrepresentations and

3    concealments, to persuade him to:

4        (a)    forego exploring other employment opportunities;

5        (b)    remain with the Company; and

6        (c)    continue to accept compensation in the form of stock options as opposed

7            to ready money.

8        13.    Dr. Bradski was given the title "Vice President, Computer Vision and Software."

9    From 2014, he, too, was progressively stripped of authority, resources, and duties.

10       14.    In early 2015, Dr. Bradski met with Mr. Abovitz, presenting ideas to increase

11   efficiency and productivity. Abovtiz assured Dr. Bradski his proposals would be taken into

12   consideration, and that Dr. Bradski would be given the authority to hire and manage his teams

13   and to innovate. He concealed that Defendant had no intention of doing so. Dr. Bradski relied

14   upon Defendant's misrepresentations that it would resource Dr. Bradski's "Advanced

15   Technology" projects, and concealed the true facts, which were that Defendant would not give

16   Dr. Bradski human resources, budget, or authority, and that he would be constructively

17   terminated, running a research "group" without objectives or resources to do so. In fact,

18   Defendant issued directives that made it impossible for any of the "Advanced Technology"

19   projects by 2016. Defendant intended Dr. Bradski to rely upon Defendant's misrepresentations

20   and concealments, to persuade him to:

21       (a)    forego exploring other employment opportunities;

22       (b)    remain with the Company; and

23       (c)    continue to accept compensation in the form of stock options as opposed

24           to ready money.

25       15.    As a result of his work with Magic Leap, Dr. Bradski had accumulated vested

26   shares as well as unvested shares as compensation, worth in excess $20 million dollars.

27       16.    As a result of his work with Magic Leap, Dr. Kaehler had accumulated vested

28   shares as well as unvested shares as compensation, worth in excess $4 million dollars.

Computerlaw Group LLP
www.computerlaw.com℠

17.     Dr. Bradski's education and professional experience, and advisory work in the area of robotics, artificial intelligence, perception, programming, and deep learning predates his employment with Magic Leap.

18.     Dr. Kaehler's education and professional experience, and advisory work in the area of robotics, artificial intelligence, perception, programming, and deep learning predates his employment with Magic Leap.

19.     Dr. Kaehler was constructively discharged in the beginning of 2016 when he was told that there was no budget for any project to be led by him. He entered negotiations for a fair exit that would allow him to continue to vest his shares and provide Magic Leap with any transitional help on the pending patent application work.[1]

20.     Dr. Bradski, likewise, was constructively discharged in 2016. As Defendant curtailed any authority, resources, and duties, and prevented any "Advanced Technology" initiatives or projects, he disclosed his plans to leave. He offered a fair exit that would allow him to continue to vest his shares and provide Magic Leap with any transitional help on the pending patent application work.[2]

21.     In March and April 2016, Plaintiffs discussed their preparations for post-Magic Leap projects with Magic Leap board member, Scott Hassan, and with Magic Leap's CEO, Mr. Mr. Abovitz.

22.     In a March 2016, in-person conversation, Plaintiffs and Mr. Hassan walked and talked in and around California Avenue, Palo Alto. Mr. Hassan assured Plaintiffs that he, Mr. Hassan, a board member, did not view their projects or ideas as conflicting with Magic Leap and did not object. He concealed the true facts, which were that Defendant intended not to honor the Consulting Provision or the rights of employees under California law, but in fact planned to retaliate with spurious allegations of misconduct and termination "for cause," and declare all

---

[1] But even that was rejected by Magic Leap in favor of the pretextual retaliatory termination of his employment and forfeiture of vested stock rights that are valued at over $2.35 million dollars.
[2] But even that was rejected by Magic Leap in favor of the pretextual retaliatory termination of his employment and forfeiture of vested stock rights that are valued at over $12.24 million dollars.

Computerlaw Group LLP
www.computerlaw.com℠

1    Plaintiffs' vested and unvested stock options forfeited. Plaintiffs relied upon Mr. Hassan's

2    misrepresentations and concealments, and Defendant intended each Plaintiff to rely upon Mr.

3    Hassan's misrepresentations and concealments, to persuade each Plaintiff to:

4              (a)    forgo immediate resignation, and instead

5              (b)    negotiate transitional agreements with Magic Leap,

6    so that Defendant could retaliate with spurious allegations of misconduct and termination "for

7    cause," and declare all Plaintiffs' vested and unvested stock options forfeited.

8         23.    In his April 2016 in-person conversation with Dr. Bradski at the Magic Leap

9    headquarters in Florida, Mr. Abovitz assured Dr. Bradski that he, Mr. Abovitz, Magic Leap's

10   CEO, did not view their projects or ideas as conflicting with Magic Leap; confirmed that

11   Defendant had no interest in doing this project themselves; and suggested that Defendant might

12   invest Robotics Actual if it were ever funded. Mr. Abovitz even asked Dr. Bradski if there were

13   people at Magic Leap with whom Dr. Bradski would be interested in pursuing these post-Magic

14   Leap projects. Defendant concealed the true facts, which were that Defendant intended not to

15   honor the Consulting Provision or the rights of employees under California law, but in fact

16   planned to retaliate with spurious allegations of misconduct and termination "for cause," and

17   declare all Plaintiffs' vested and unvested stock options forfeited. Plaintiffs relied upon Mr.

18   Abovitz's misrepresentations and concealments, and Defendant intended each Plaintiff to rely

19   upon Mr. Abovitz's misrepresentations and concealments, to persuade each Plaintiff to:

20             (a)    forgo immediate resignation, and instead

21             (b)    negotiate transitional agreements with Magic Leap,

22   so that Defendant could retaliate with spurious allegations of misconduct and termination "for

23   cause," and declare all Plaintiffs' vested and unvested stock options forfeited.

24        24.    In April and May 2016, Dr. Kaehler discussed his transition plan with Laura

25   Langehaug, the VP of Human Resources at Magic Leap. Ms. Langehaug assured Dr. Kaehler that

26   Dr. Kaehler's transition plan and post-Magic Leap plans were acceptable to Magic Leap. Ms.

27   Langehaug concealed the true facts, which were that Magic Leap intended not to honor the

28   Consulting Provision or the rights of employees under California law, but in fact planned to

Computerlaw Group LLP
www.computerlaw.com℠

1 retaliate with spurious allegations of misconduct and termination "for cause," and declare all

2 Plaintiffs' vested and unvested stock options forfeited. Plaintiffs relied upon Ms. Langehaug's

3 misrepresentations and concealments, and Defendant intended each Plaintiff to rely upon Mr.

4 Langehaug's misrepresentations and concealments, to persuade each Plaintiff to:

5         (a)   forgo immediate resignation, and instead

6         (b)   negotiate transitional agreements with Magic Leap,

7 so that Defendant could retaliate with spurious allegations of misconduct and termination "for

8 cause," and declare all Plaintiffs' vested and unvested stock options forfeited.

9      25.   In April and May 2016, Dr. Kaehler discussed his transition plan with Henk

10 Vlietstra (Ms. Langehaug and Dr. Kaehler's boss at Magic Leap). Dr. Kaehler made clear that it

11 was his intention to work in robotics and in a manner non-competitive with Magic Leap. Mr.

12 Vlietstra assured Dr. Kaehler that Dr. Kaehler's transition plan and post-Magic Leap plans were

13 acceptable to Defendant. Mr. Vlietstra concealed the true facts, which were that Defendant

14 intended not to honor the Consulting Provision or the rights of employees under California law,

15 but in fact planned to retaliate with spurious allegations of misconduct and termination "for

16 cause," and declare all Plaintiffs' vested and unvested stock options forfeited. Plaintiffs relied

17 upon Mr. Vlietstra's misrepresentations and concealments, and Defendant intended each Plaintiff

18 to rely upon Mr. Vlietstra's misrepresentations and concealments, to persuade each Plaintiff to:

19         (a)   forgo immediate resignation, and instead

20         (b)   negotiate transitional agreements with Magic Leap,

21 so that Defendant could retaliate with spurious allegations of misconduct and termination "for

22 cause," and declare all Plaintiffs' vested and unvested stock options forfeited.

23      26.   In April 2016, Dr. Kaehler discussed his transition plan with the CEO, Mr.

24 Abovitz. Dr. Kaehler made clear that it was his intention to work in robotics and in a manner

25 non-competitive with Magic Leap. Mr. Abovitz confirmed that Defendant had no interest in

26 doing this project itself, and that Dr. Kaehler's transition plan was acceptable to Defendant. He

27 concealed the true facts, which were that Defendant intended not to honor the Consulting

28 Provision or the rights of employees under California law, but in fact planned to retaliate with

Computerlaw Group LLP
www.computerlaw.com℠

spurious allegations of misconduct and termination "for cause," and declare all Plaintiffs' vested

and unvested stock options forfeited. Plaintiffs relied upon Mr. Abovitz's misrepresentations and

concealments, and Defendant intended each Plaintiff to rely upon Mr. Abovitz's

misrepresentations and concealments, to persuade each Plaintiff to:

> (a)   forgo immediate resignation, and instead

> (b)   negotiate transitional agreements with Magic Leap,

so that Defendant could retaliate with spurious allegations of misconduct and termination "for

cause," and declare all Plaintiffs' vested and unvested stock options forfeited.

27.   Defendant terminated Dr. Kaehler and Dr. Bradski's employment without notice,

claiming falsely that the terminations were "for cause," and stated that Defendant would not

require Dr. Kaehler and Dr. Bradski each to forfeit his respective vested and unvested stock

rights in Magic Leap.

28.   Both Plaintiffs requested exit interviews multiple times, both in writing and

verbally. Both Plaintiffs requested in writing that the questions they raised about their

termination be investigated and reconsidered by the independent board.

29.   The ideas for the projects Dr. Bradski and Dr. Kaehler were preparing for post-

Magic Leap occupation in their fields predate their employment with Magic Leap, and their

preparations were based entirely on these independent, prior ideas and were entirely unrelated to

the work Dr. Bradski and Dr. Kaehler did for Magic Leap as its employees. When Dr. Bradski

and Dr. Kaehler started pursuing their independent project in their spare time, it had nothing

whatsoever to do with anything that Magic Leap was working on. Their preparations for post-

Magic Leap occupation in their fields were noncompetitive and unrelated to all their work,

research, or development for Magic Leap, and noncompetitive and unrelated to any actual or

demonstrably anticipated research or development at Magic Leap.

30.   In fact, Defendant made clear to Plaintiffs that they did not view the project or

preparations as conflicting or competitive. Defendant offered both Dr. Kaehler and Dr. Bradski

advisor agreements to transition out of employment. Mr. Abovitz stated he might be willing to be

an advisor if Dr. Kaehler and Dr. Bradski were able to secure funding for the project in the

Computerlaw Group LLP
www.computerlaw.com℠

1   Silicon Valley. Although, as Defendant was told in writing no later than May 22, 2016, the acts

2   and conduct of Defendant against these former employees prevents any project by them from

3   being fundable or at all viable. The retaliatory and anticompetitive acts and practices as alleged

4   prevents Plaintiffs from securing funding for their projects.

5   **FIRST CLAIM FOR RELIEF**

6   **Wrongful Termination in Violation of Public Policy in Cal. Labor Code § 2870**

7     31. Plaintiffs Gary Bradski and Adrian Kaehler incorporate by reference each and

8   every allegation set forth in paragraphs 1–30, as if set forth at length here.

9     32. It is public policy that inures to the benefit of the public at large in California that

10   an employee is entitled to ownership of his own intellectual property that does not relate to the

11   employer's business, or actual or demonstrably anticipated research or development; that does

12   not result from any work performed by the employee for the employer; and that is developed

13   entirely on his or her own time without using the employer's equipment, supplies, facilities, or

14   trade secret information. Cal. Labor Code § 2870(a).

15
16       To the extent a provision in an employment agreement purports to require an
            employee to assign an invention otherwise excluded from being required to be
            assigned under subdivision (a), the provision is against the public policy of this
17       state and is unenforceable.

18   *Id*., subd. (d).

19     33. This public policy is fundamental and substantial, inures to the benefit of the

20   public at large, and was well-established at the time of each Plaintiff's discharge. Plaintiffs were

21   Magic Leap employees entitled to the rights and privileges of California employees under the

22   Labor Code.

23     34. Defendant discharged each Plaintiff for (a) exercising his respective statutory

24   rights and privileges under this California Labor Code § 2870 and (b) reporting the violation of

25   this statute to Magic Leap's Board.

26     35. Plaintiffs made preparations to work together, in their fields, post-Magic Leap, on

27   a project in perception robotics, that fulfil the requirements of California Labor Code § 2870(a).

28   The ideas and preparations:

Computerlaw Group LLP
www.computerlaw.com℠

(a)     Were not related to Magic Leap's business or any actual or demonstrably anticipated research or development;

(b)     Were not conceived as a result of any work Plaintiffs performed for Magic Leap;

(c)     Were based upon ideas and preparations that predate their employment at Magic Leap by years, going back to at least 2008;

(d)     Were not developed from any Magic Leap equipment, supplies, facility, or trade secrets; and

(e)     Were developed on Plaintiffs' separate time, with their separate money, supplies, equipment, and facilities, from work in deep reinforcement learning and robotics being done and published by third parties with no connection to Magic Leap.

36.     Defendant wrongfully terminated Dr. Bradski in violation of California public policy, on the unenforceable grounds that Dr. Bradski's Employment Agreement required or purported to require Dr. Bradski, as an employee, to assign an invention or intellectual property that is and was otherwise excluded from being required to be assigned under California Labor Code § 2870(a).

37.     Defendant wrongfully terminated Dr. Kaehler in violation of California public policy, on the unenforceable grounds that Dr. Kaehler's Employment Agreement required or purported to require Dr. Kaehler, as an employee, to assign an invention or intellectual property that is and was otherwise excluded from being required to be assigned under California Labor Code § 2870(a).

38.     Defendant intended to harass and intimidate Plaintiffs, to cause each and both of them emotional distress, and to designed to pressure the employees in negotiations with their employer over the terms of their separation and transition from the company, to enable Magic Leap to negotiate a better deal for itself and to force Plaintiffs to accept worse terms.

39.     Defendant also intended, by making an example out of Plaintiffs, to harass and intimidate its remaining California employees.

Computerlaw Group LLP
www.computerlaw.com℠

40.     Each Plaintiff reported this violation of California public policy to the Magic Leap Board in writing, and requested that an independent Board investigate and correct the violations. Defendant and Magic Leap's Board refused to investigate, or mitigate the harm from, its actions after notice to the Company, and confirmed the discharge of these California employees to retaliate against them.

41.     Defendant's wrongful conduct proximately caused or otherwise was a substantial factor in causing substantial monetary damages to each these California citizens and former employees. The actual damages caused in loss vested and unvested compensation caused are substantial and continuing, and exceed $14.59 million.

42.     Defendant's wrongful and malicious conduct caused irreparable injury and proximately caused or otherwise was a substantial factor in causing continuing harm to Plaintiffs which is not fully compensable in monetary damages. Defendant caused harm to each Plaintiff's ability to find gainful employment in his fields; to their business goodwill and prospective business by tarnishing Plaintiffs' reputations in the Silicon Valley and nationwide; by preventing them from raising capital or hiring any partners or employees; and by clouding the title to their ideas and any intellectual property that may be developed by them from their separately owned, independent work. Defendant refused to cooperate with restoration of Plaintiffs' reputations and recovery of Plaintiffs' vested and earned compensation when asked to do so.

43.     Each Plaintiff has been damaged by the wrongful termination, or Defendant's wrongful discharge substantial factor in causing continuing harm to each Plaintiff which is not compensable in money damages. California has an interest in enjoining this employer, Magic Leap, which has many California employees, to ensure that it does not repeat its wrongful acts and course of conduct in violation of the public policy codified in California Labor Code § 2870, and that similarly situated employers do not pursue similar courses of wrongful conduct in violation of this established, fundamental, and substantial public policy protecting California employees.

44.     Defendant knew that its acts and those of its agents, and each of them, were wrongful, reckless, destructive, and constituted in violations of California public policy and

Computerlaw Group LLP
www.computerlaw.com℠

1    breaches of its Employment Agreements and the covenant of good faith and fair dealing it had

2    with each Plaintiff. It further knew that its actions would cause harm Plaintiffs at a time when the

3    targets of its conduct were financially vulnerable to their employer's wrongful conduct,

4    exacerbating the economic and other harm. Defendant caused harm to Plaintiffs through its

5    intentional malice, trickery, and deceit. Its acts and those of its agents, and each of them, were

6    reprehensible and willful, malicious, oppressive, and fraudulent, warranting an award of punitive

7    damages up to ten times the compensatory award, or otherwise as allowed by law, to punish and

8    deter such conduct in the future. U.S. Const. amend. XIV, § 1; Cal. Const., art. I, § 7(a), Cal. Civ.

9    Code § 3294 (2015).

10                              <u>**S**ECOND **C**LAIM FOR **R**ELIEF</u>

11    **<u>Wrongful Termination in Violation of Public Policy in Cal. Bus. & Prof. Code § 16600</u>**

12           45.     Plaintiffs Gary Bradski and Adrian Kaehler incorporate by reference each and

13    every allegation set forth in paragraphs 1–44, as if set forth at length here.

14           46.     It is public policy that inures to the benefit of the public at large in California that

15    in employment agreements "(a) Except as provided in this chapter, every contract by which

16    anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to

17    that extent void." Cal. Bus. & Prof. Code § 16600. This public policy is established to protect the

18    right of every California citizen to gainful employment in his or her field or profession.

19           47.     This public policy is fundamental and substantial, inures to the benefit of the

20    public at large, and was well-established at the time of each Plaintiff's discharge. Plaintiffs were

21    Magic Leap employees entitled to the rights and privileges of California employees under the

22    Business & Professions Code. Defendant discharged each Plaintiff for (a) exercising his

23    respective contractual and statutory rights and privileges under Business & Professions Code

24    § 16600 and Labor Code § 2870; and (b) reporting the violation of this statute to Magic Leap's

25    board.

26           48.     Plaintiffs made preparations to work together, in their fields, post-Magic Leap, on

27    a project in perception robotics, that are protected under California Business & Professions Code

28    § 16600. Their ideas and preparations:

Computerlaw Group LLP
www.computerlaw.com<sup>sm</sup>

Computerlaw Group LLP
www.computerlaw.com℠

(a)    Were permitted under the Contracting Provision of each Plaintiff's Agreement with Magic Leap;

(b)    Were protected by Labor Code § 2870;

(c)    Were disclosed to Defendant, without misleading by Plaintiffs, or either of them as alleged above;

(d)    Were confirmed by Defendant that they were not competitive to or related to Magic Leap's business or any actual or demonstrably anticipated research or development;

(e)    Were not conceived as a result of any work Plaintiffs performed for Magic Leap;

(f)    Were based upon ideas and preparations predating their employment at Magic Leap by years, going back to at least 2008;

(g)    Were not developed from any Magic Leap equipment, supplies, facility, or trade secrets, and

(h)    Were developed on Plaintiffs' separate time, with their separate money, supplies, equipment, and facilities, from work in deep reinforcement learning and robotics being done and published by third parties with no connection to Magic Leap.

49.    Defendant wrongfully terminated Dr. Bradski in violation of California public policy, on the unenforceable and void grounds that Dr. Bradski's Employment Agreement required or purported to restrain Dr. Bradski from engaging in a lawful profession, trade, or business of any kind.

50.    Defendant wrongfully terminated Dr. Kaehler in violation of California public policy, on the unenforceable and void grounds that Dr. Kaehler's Employment Agreement required or purported to restrain Dr. Kaehler from engaging in a lawful profession, trade, or business of any kind.

51.    Defendant intended to harass and intimidate Plaintiffs, to cause each and both of them emotional distress, and its conduct was designed to pressure the employees in negotiations

with their employer over the terms of their separation and transition from the company, to enable Defendant to negotiate a better deal for itself and to force Plaintiffs to accept worse terms.

52.     Defendant also intended, by making an example out of Plaintiffs, to harass and intimidate its remaining California employees.

53.     Each Plaintiff reported this violation of California public policy to the Magic Leap Board in writing, and requested that an independent Board investigate and correct the violations. Defendant and Magic Leap's Board refused to investigate, or mitigate the harm from, its actions after notice to the Company, and confirmed the discharge of these California employees to retaliate against them.

54.     Defendant's wrongful conduct proximately caused or otherwise was a substantial factor in causing substantial monetary damages to each these California citizens and former employees. The actual damages caused in loss vested and unvested compensation caused are substantial and continuing, and exceed $14.59 million.

55.     Defendant's wrongful and malicious conduct caused irreparable injury and proximately caused or otherwise was a substantial factor in causing continuing harm to Plaintiffs which is not fully compensable in monetary damages. Defendant caused harm to each Plaintiff's ability to find gainful employment in his fields; to their business goodwill and prospective business by tarnishing Plaintiffs' reputations in the Silicon Valley and nationwide; by preventing them from raising capital or hiring any partners or employees; and by clouding the title to their ideas and any intellectual property that may be developed by them from their separately owned, independent work. Defendant refused to cooperate with restoration of Plaintiffs' reputations and recovery of Plaintiffs' vested and earned compensation when asked to do so.

56.     Each Plaintiff has been damaged by the wrongful termination, or Defendant's wrongful discharge substantial factor in causing continuing harm to each Plaintiff which is not compensable in money damages. California has an interest in enjoining this employer, Magic Leap, which has many California employees, to ensure that it does not repeat its wrongful acts and course of conduct in violation of the public policy codified in California Business & Professions Code § 16600, and that similarly situated employers do not pursue similar courses of

Computerlaw Group LLP
www.computerlaw.com℠

Computerlaw Group LLP
www.computerlaw.com℠

1  wrongful conduct in violation of this established, fundamental, and substantial public policy

2  protecting California employees.

3       57.     Defendant knew that its acts and those of its agents, and each of them, were

4  wrongful, reckless, destructive, and constituted in violations of California public policy and

5  breaches of its Employment Agreements and the covenant of good faith and fair dealing it had

6  with each Plaintiff. It further knew that its actions would cause harm Plaintiffs at a time when the

7  targets of its conduct were financially vulnerable to their employer's wrongful conduct,

8  exacerbating the economic and other harm. Defendant caused harm to Plaintiffs through its

9  intentional malice, trickery, and deceit. Its acts and those of its agents, and each of them, were

10  reprehensible and willful, malicious, oppressive, and fraudulent, warranting an award of punitive

11  damages up to ten times the compensatory award, or otherwise as allowed by law, to punish and

12  deter such conduct in the future. U.S. Const. amend. XIV, § 1; Cal. Const., art. I, § 7(a), Cal. Civ.

13  Code § 3294 (2015).

14  **THIRD CLAIM FOR RELIEF**

15  **Wrongful Termination in Violation of California Labor Code §§ 200–203**

16       58.     Plaintiffs Gary Bradski and Adrian Kaehler incorporate by reference each and

17  every allegation set forth in paragraphs 1–57, as if set forth at length here.

18       59.     The California Labor Code wage and hours laws "concern not only the health and

19  welfare of the workers themselves, but also the public health and general welfare." [Citation.]'

20  … [¶] … [T]here is in this state a fundamental and substantial public policy protecting an

21  employee's wages . . . ." *Phillips v. Gemini Moving Specialists,* 63 Cal. App. 4th 563, 574

22  (1998).

23       60.     The protections of Labor Code §§ 200–203 express a strong public policy for

24  prompt payment of laborers that cannot be undercut by any industry habit or custom to the

25  contrary. Labor Code, § 219 provides, in part, "but no provisions of this article [encompassing

26  §§ 200 through 240] can in any way be contravened or set aside by private agreement, whether

27  written, oral or implied."

28

61. Accordingly, this is public policy that inures to the benefit of the public at large in California that in employment agreements that a California employee's earned wages are due and payable immediately at the time of discharge. Cal, Labor Code § 201; *see also id*., §§ 202–203. This public policy is established to protect the right of every California citizen to the wages earned in employment.

62. This public policy is fundamental and substantial, inures to the benefit of the public at large, and was well-established at the time of each Plaintiff's discharge. Plaintiffs were Magic Leap employees entitled to the rights and privileges of California employees under the California Labor Code. Plaintiff's compensation earned as an employee of Magic Leap included incentive stock options, as alleged above. Defendant discharged each Plaintiff (a) in order to avoid performing its statutory rights obligation to each Plaintiff under Labor Code §§ 200–203; (b) to retaliate against each Plaintiff for exercising his contractual and statutory rights and privileges as alleged above; and (c) for reporting the violations of this statute to Magic Leap's Board, where the acts and conduct Defendant claimed formed the basis for termination:

(a) Were protected under California Business & Professions Code § 16600.

(b) Were permitted under the Contracting Provision of each Plaintiff's Agreement with Magic Leap;

(c) Were protected by Labor Code § 2870(a);

(d) Were disclosed to Defendant, without misleading by Plaintiffs, or either of them as alleged above;

(e) Were confirmed by Defendant that they were not competitive to or related to Magic Leap's business or any actual or demonstrably anticipated research or development;

(f) Were not conceived as a result of any work Plaintiffs performed for Magic Leap;

(g) Were based upon ideas and preparations predating their employment at Magic Leap by years, going back to at least 2008;

Computerlaw Group LLP
www.computerlaw.com℠

1         (h)      Were not developed from any Magic Leap equipment, supplies, facility, or

2                       trade secrets, and

3         (i)        Were developed on Plaintiffs' separate time, with their separate money,

4                       supplies, equipment, and facilities, from work in deep reinforcement

5                       learning and robotics being done and published by third parties with no

6                       connection to Magic Leap.

7     63.    Defendant wrongfully terminated Dr. Bradski in violation of California public

8 policy, in order to avoid paying him vested stock options, and to avoid any unvested stock

9 options from continuing to vest under either continued employment or a transition plan.

10     64.    Defendant wrongfully terminated Dr. Kaehler in violation of California public

11 policy, in order to avoid paying him vested stock options, and to avoid any unvested stock

12 options from continuing to vest under either continued employment or a transition plan.

13     65.    Defendant intended to harass and intimidate Plaintiffs, to cause each and both of

14 them emotional distress, and its conduct was designed to pressure the employees in negotiations

15 with their employer over the terms of their separation and transition from the company, to enable

16 Defendant to negotiate a better deal for itself and to force Plaintiffs to accept worse terms.

17     66.    Defendant also intended, by making an example out of Plaintiffs, to harass and

18 intimidate its remaining California employees, to show them that Defendant could violate

19 contractual and statutory obligations with impunity.

20     67.    Each Plaintiff reported this violation of California public policy to the Magic

21 Leap Board in writing, and requested that an independent Board investigate and correct the

22 violations. Defendant and Magic Leap's Board refused to investigate, or mitigate the harm from,

23 its actions after notice to the Company, and confirmed the discharge of these California

24 employees to retaliate against them.

25     68.    Magic Leap's wrongful conduct proximately caused or otherwise was a

26 substantial factor in causing substantial monetary damages to each these California citizens and

27 former employees. The actual damages caused in loss vested and unvested compensation caused

28 are substantial and continuing, and exceed $14.59 million not including interest.

Computerlaw Group LLP
www.computerlaw.com℠

69.     Magic Leap's wrongful and malicious conduct caused irreparable injury and proximately caused or otherwise was a substantial factor in causing continuing harm to Plaintiffs which is not fully compensable in monetary damages. Magic Leap caused harm to each Plaintiff's ability to find gainful employment in his fields; to their business goodwill and prospective business by tarnishing Plaintiffs' reputations in the Silicon Valley and nationwide; by preventing them from raising capital or hiring any partners or employees; and by clouding the title to their stock and stock options. Magic Leap refused to cooperate with restoration of Plaintiffs' reputations and recovery of Plaintiffs' vested and earned compensation when asked to do so.

70.     Each Plaintiff has been damaged by the wrongful termination, or Magic Leap's wrongful discharge substantial factor in causing continuing harm to each Plaintiff which is not compensable in money damages. California has an interest in enjoining this employer, Defendant, which has many California employees, to ensure that it does not repeat its wrongful acts and course of conduct in violation of the public policy codified in California Labor Code § 221, and that similarly situated employers do not pursue similar courses of wrongful conduct in violation of this established, fundamental, and substantial public policy protecting California employees.

71.     Magic Leap knew that its acts and those of its agents, and each of them, were wrongful, reckless, destructive, and constituted in violations of California public policy and breaches of its Employment Agreements and the covenant of good faith and fair dealing it had with each Plaintiff. It further knew that its actions would cause harm Plaintiffs at a time when the targets of its conduct were financially vulnerable to their employer's wrongful conduct, exacerbating the economic and other harm. Defendant caused harm to Plaintiffs through its intentional malice, trickery, and deceit. Its acts and those of its agents, and each of them, were reprehensible and willful, malicious, oppressive, and fraudulent, warranting an award of punitive damages up to ten times the compensatory award, or otherwise as allowed by law, to punish and deter such conduct in the future. U.S. Const. amend. XIV, § 1; Cal. Const., art. I, § 7(a), Cal. Civ. Code § 3294 (2015).

Computerlaw Group LLP
www.computerlaw.com℠

### FOURTH CLAIM FOR RELIEF

### Wrongful Termination in Violation of California Labor Code § 221

72.     Plaintiffs Gary Bradski and Adrian Kaehler incorporate by reference each and every allegation set forth in paragraphs 1–71, as if set forth at length here.

73.     The California Labor Code wage and hours laws "concern not only the health and welfare of the workers themselves, but also the public health and general welfare." [Citation.]' … [¶] … [T]here is in this state a fundamental and substantial public policy protecting an employee's wages, and that protection includes freedom from setoffs . . . ." *Phillips,* 63 Cal. App. 4th at 574.

74.     It is public policy that inures to the benefit of the public at large in California that in employment agreements that "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Cal. Labor Code § 221. "[S]ection 221 was enacted in order to prevent employers from utilizing secret deductions or kickbacks to pay employees less than their stated wages." *Finnegan v. Schrader,* 91 Cal. App. 4th 572, 584 (2001). This public policy is established to protect the right of every California citizen to gainful employment in his or her field or profession.

75.     This public policy is fundamental and substantial, inures to the benefit of the public at large, and was well-established at the time of each Plaintiff's discharge. Plaintiffs were Magic Leap employees entitled to the rights and privileges of California employees under the Business & Professions Code. Plaintiff's compensation earned as an employee of Magic Leap included incentive stock options, as alleged above. Defendant discharged each Plaintiff (a) in order to avoid performing its statutory rights obligation to each Plaintiff under Labor Code § 221; (b) to retaliate against each Plaintiff for exercising his contractual and statutory rights and privileges as alleged above; and (c) for reporting the violation of this statute to Magic Leap's board, where the acts and conduct Defendant claimed formed the basis for termination:

(a)     Were protected under California Business & Professions Code § 16600.

(b)     Were permitted under the Contracting Provision of each Plaintiff's Agreement with Magic Leap;

Computerlaw Group LLP
www.computerlaw.com℠

(c)   Were protected by Labor Code § 2870(a);

(d)   Were disclosed to Defendant, without misleading by Plaintiffs, or either of them as alleged above;

(e)   Were confirmed by Defendant that they were not competitive to or related to Magic Leap's business or any actual or demonstrably anticipated research or development;

(f)   Were not conceived as a result of any work Plaintiffs performed for Magic Leap;

(g)   Were based upon ideas and preparations predating their employment at Magic Leap by years, going back to at least 2008;

(h)   Were not developed from any Magic Leap equipment, supplies, facility, or trade secrets, and

(i)   Were developed on Plaintiffs' separate time, with their separate money, supplies, equipment, and facilities, from work in deep reinforcement learning and robotics being done and published by third parties with no connection to Magic Leap.

76.   Defendant wrongfully terminated Dr. Bradski in violation of California public policy, in order to avoid paying him vested stock options, and to avoid any unvested stock options from continuing to vest under either continued employment or a transition plan.

77.   Defendant wrongfully terminated Dr. Kaehler in violation of California public policy, in order to avoid paying him vested stock options, and to avoid any unvested stock options from continuing to vest under either continued employment or a transition plan.

78.   Defendant intended to harass and intimidate Plaintiffs, to cause each and both of them emotional distress, and its conduct was designed to pressure the employees in negotiations with their employer over the terms of their separation and transition from the company, to enable Defendant to negotiate a better deal for itself and to force Plaintiffs to accept worse terms.

79.   Defendant also intended, by making an example out of Plaintiffs, to harass and intimidate its remaining California employees.

Computerlaw Group LLP
www.computerlaw.com℠

80.      Each Plaintiff reported this violation of California public policy to the Magic Leap Board in writing, and requested that an independent Board investigate and correct the violations. Defendant and Magic Leap's Board refused to investigate, or mitigate the harm from, its actions after notice to the Company, and confirmed the discharge of these California employees to retaliate against them.

81.      Defendant's wrongful conduct proximately caused or otherwise was a substantial factor in causing substantial monetary damages to each these California citizens and former employees. The actual damages caused in loss vested and unvested compensation caused are substantial and continuing, and exceed $14.59 million, not including interest.

82.      Defendant's wrongful and malicious conduct caused irreparable injury and proximately caused or otherwise was a substantial factor in causing continuing harm to Plaintiffs which is not fully compensable in monetary damages. Defendant caused harm to each Plaintiff's ability to find gainful employment in his fields; to their business goodwill and prospective business by tarnishing Plaintiffs' reputations in the Silicon Valley and nationwide; by preventing them from raising capital or hiring any partners or employees; and by clouding the title to their stock and stock options. Defendant refused to cooperate with restoration of Plaintiffs' reputations and recovery of Plaintiffs' vested and earned compensation when asked to do so.

83.      Each Plaintiff has been damaged by the wrongful termination, or Defendant's wrongful discharge substantial factor in causing continuing harm to each Plaintiff which is not compensable in money damages. California has an interest in enjoining this employer, Magic Leap, which has many California employees, to ensure that it does not repeat its wrongful acts and course of conduct in violation of the public policy codified in California Labor Code §§ 200–203, and that similarly situated employers do not pursue similar courses of wrongful conduct in violation of this established, fundamental, and substantial public policy protecting California employees.

84.      Defendant knew that its acts and those of its agents, and each of them, were wrongful, reckless, destructive, and constituted in violations of California public policy and breaches of its Employment Agreements and the covenant of good faith and fair dealing it had

Computerlaw Group LLP
www.computerlaw.com℠

Computerlaw Group LLP
www.computerlaw.com℠

1   with each Plaintiff. It further knew that its actions would cause harm Plaintiffs at a time when the

2   targets of its conduct were financially vulnerable to their employer's wrongful conduct,

3   exacerbating the economic and other harm. Defendant caused harm to Plaintiffs through its

4   intentional malice, trickery, and deceit. Its acts and those of its agents, and each of them, were

5   reprehensible and willful, malicious, oppressive, and fraudulent, warranting an award of punitive

6   damages up to ten times the compensatory award, or otherwise as allowed by law, to punish and

7   deter such conduct in the future. U.S. Const. amend. XIV, § 1; Cal. Const., art. I, § 7(a), Cal. Civ.

8   Code § 3294 (2015).

9                               FIFTH CLAIM FOR RELIEF

10                              **Labor Code Violations**

11       85.    Plaintiffs Gary Bradski and Adrian Kaehler incorporate by reference each and

12   every allegation set forth in paragraphs 1–84, as if set forth at length here.

13       86.    Plaintiffs were each employees of Magic Leap under written employment

14   agreements. Plaintiff's compensation earned as an employee of Magic Leap included incentive

15   stock options, as alleged above. Magic Leap failed and refused to perform its statutory

16   obligations under:

17            (a)     California Labor Code §§ 200–203, which require wages earned and

18                    unpaid at the time of discharge or quitting are due and payable

19                    immediately; and

20            (b)     California Labor Code § 221, which make it "unlawful for any employer

21                    to collect or receive from an employee any part of wages theretofore paid

22                    by said employer to said employee."

23       87.    As alleged above, on or about May 26, 2016 without a warning, an exit interview,

24   or an opportunity to be heard, Defendant purported to terminate each Plaintiffs "for cause."

25   Defendant claims that each Plaintiff's vested and unvested incentive stock options were forfeited

26   for misconduct. Defendant terminated each Plaintiff for acts and conduct that were:

27            (a)     Were protected under California Business & Professions Code § 16600.

28

Computerlaw Group LLP
www.computerlaw.com℠

(b)     Were permitted under the Contracting Provision of each Plaintiff's

Agreement with Magic Leap;

(c)     Were protected by Labor Code § 2870(a);

(d)     Were disclosed to Defendant, without misleading by Plaintiffs, or either of

them as alleged above;

(e)     Were confirmed by Defendant that they were not competitive to or related

to Magic Leap's business or any actual or demonstrably anticipated

research or development;

(f)     Were not conceived as a result of any work Plaintiffs performed for Magic

Leap;

(g)     Were based upon ideas and preparations predating their employment at

Magic Leap by years, going back to at least 2008;

(h)     Were not developed from any Magic Leap equipment, supplies, facility, or

trade secrets, and

(i)     Were developed on Plaintiffs' separate time, with their separate money,

supplies, equipment, and facilities, from work in deep reinforcement

learning and robotics being done and published by third parties with no

connection to Magic Leap.

88.     On the date Defendant terminated Dr. Kaehler's employment, plaintiff not been

paid accrued wages, including earned and vested stock options, and was owed those wages,

valued in the amount of $2.35 million based on the number of vested stock options, and the fair

market value per share of such stock. Defendant's failure to pay the full amount due plaintiff on

termination violates the provisions of the California Labor Code, and the stock options, or their

fair market value, are now due and owing to Dr. Kaehler for the sum of not less than $2.35

million. Defendant has failed and refused, and continues to fail and refuse, to pay either this

amount due or confirm Dr. Kaehler's right, title, and interest in and to the stock. Under

California Labor Code § 218.5, Dr. Kaehler requests that the court award plaintiff reasonable

attorney's fees and costs incurred by him/her in this action. Under California Labor Code

Computerlaw Group LLP
www.computerlaw.com℠

1   § 218.6, Dr. Kaehler also requests that the court award him interest on all due and unpaid wages,

2   at the legal rate specified by Civil Code § 3289(b), accruing from the date the wages were due

3   and payable.

4   89.   Defendant's failure to pay Dr. Kaehler's wages, as alleged, was willful in that

5   Defendant knew that its acts and those of its agents, and each of them, were wrongful, reckless,

6   destructive, and constituted in violations of California public policy and breaches of its

7   Employment Agreements and the covenant of good faith and fair dealing it had with each

8   Plaintiff. It failed and refused to perform its statutory obligations despite written notice to its

9   Board requesting that the Board investigate and correct the conduct. It further knew that its

10  actions would cause harm Dr. Kaehler at a time when the targets of its conduct were financially

11  vulnerable to their employer's wrongful conduct, exacerbating the economic and other harm.

12  Defendant caused harm to Dr. Kaehler through its intentional malice, trickery, and deceit. Its acts

13  and those of its agents, and each of them, were reprehensible and willful, malicious, oppressive,

14  and fraudulent, warranting an award of punitive damages up to ten times the compensatory

15  award, or otherwise as allowed by law, to punish and deter such conduct in the future. U.S.

16  Const. amend. XIV, § 1; Cal. Const., art. I, § 7(a), Cal. Civ. Code § 3294 (2015).  Dr. Kaehler is

17  entitled to penalties under Labor Code § 203, which provides that an employee's wages shall

18  continue as a penalty until paid or for a period of up to 30 days from the time they were due,

19  whichever period is shorter. Defendant failed to pay plaintiff the vested stock options or their fair

20  market value of $2.35 million at the time of termination and has failed to pay ever since. Under

21  Labor Code § 203, Dr. Kaehler is entitled to a penalty at the rate of $569.44 per day, multiplied

22  by 30 days in the full amount of $17,083.33.[3]

23  90.   On the date Defendant terminated Dr. Bradski's employment, plaintiff not been

24  paid accrued wages, including earned and vested stock options, and was owed those wages,

25  valued in the amount of $12.24 million based on the number of vested stock options, and the fair

26  market value per share of such stock. Defendant's failure to pay the full amount due plaintiff on

27

28  [3] See ¶131, below.

termination violates the provisions of the California Labor Code, and the stock options, or their fair market value, are now due and owing to Dr. Bradski for the sum of not less than $12.24 million. Defendant has failed and refused, and continues to fail and refuse, to pay either this amount due or confirm Dr. Bradski's right, title, and interest in and to the stock. Under California Labor Code § 218.5, Dr. Bradski requests that the court award plaintiff reasonable attorney's fees and costs incurred by him/her in this action. Under California Labor Code § 218.6, Dr. Bradski also requests that the court award him interest on all due and unpaid wages, at the legal rate specified by Civil Code § 3289(b), accruing from the date the wages were due and payable.

91.    Defendant's failure to pay Dr. Bradski's wages, as alleged, was willful in that Defendant knew that its acts and those of its agents, and each of them, were wrongful, reckless, destructive, and constituted in violations of California public policy and breaches of its Employment Agreements and the covenant of good faith and fair dealing it had with each Plaintiff. It failed and refused to perform its statutory obligations despite written notice to its Board requesting that the Board investigate and correct the conduct. It further knew that its actions would cause harm Dr. Bradski at a time when the targets of its conduct were financially vulnerable to their employer's wrongful conduct, exacerbating the economic and other harm. Defendant caused harm to Dr. Bradski through its intentional malice, trickery, and deceit. Its acts and those of its agents, and each of them, were reprehensible and willful, malicious, oppressive, and fraudulent, warranting an award of punitive damages up to ten times the compensatory award, or otherwise as allowed by law, to punish and deter such conduct in the future. U.S. Const. amend. XIV, § 1; Cal. Const., art. I, § 7(a), Cal. Civ. Code § 3294 (2015). Dr. Bradski is entitled to penalties under Labor Code § 203, which provides that an employee's wages shall continue as a penalty until paid or for a period of up to 30 days from the time they were due, whichever period is shorter. Defendant failed to issue each Plaintiff the vested stock options or pay their fair market value, at the time of termination and has failed to pay ever since. Under

Computerlaw Group LLP
www.computerlaw.com<sup>sm</sup>

Computerlaw Group LLP
www.computerlaw.com℠

1   Labor Code § 203, Dr. Bradski is entitled to a penalty at the rate of $527.77 per day, multiplied

2   by 30 days in the full amount of $15,833.33.[4]

3         92.    Defendant further caused damages to each and both Plaintiffs by violating Labor

4   Code § 221, and each Plaintiff is further entitled to the compensatory damages in an amount to

5   be proved at trial, but not less than the fair market value of the wages that were deducted

6   unlawfully from each Plaintiff's wages, as alleged. Further, Defendant's conduct was willful in

7   that Defendant knew that its acts and those of its agents, and each of them, were wrongful,

8   reckless, destructive, and constituted in violations of California public policy and breaches of its

9   Employment Agreements and the covenant of good faith and fair dealing it had with each

10  Plaintiff. It failed and refused to perform its statutory obligations despite written notice to its

11  Board requesting that the Board investigate and correct the conduct. It further knew that its

12  actions would cause harm Plaintiffs, and each of them, at a time when the targets of its conduct

13  were financially vulnerable to their employer's wrongful conduct, exacerbating the economic

14  and other harm. Defendant caused harm to Plaintiffs, and each of them, through its intentional

15  malice, trickery, and deceit. Its acts and those of its agents, and each of them, were reprehensible

16  and willful, malicious, oppressive, and fraudulent, warranting an award of punitive damages up

17  to ten times the compensatory award, or otherwise as allowed by law, to punish and deter such

18  conduct in the future. U.S. Const. amend. XIV, § 1; Cal. Const., art. I, § 7(a), Cal. Civ. Code §

19  3294 (2015).

20        93.    Dr. Kaehler is entitled to additional penalties under Labor Code § 203 for the

21  § 221 violations. Defendant confiscated as an unlawful penalty the vested stock options or their

22  fair market value of $2.35 million, at the time of termination and has failed to issue the stock or

23  pay the fair market value ever since. § 203, Dr. Kaehler is entitled to a penalty at the rate of

24  $569.44 per day, multiplied by 30 days in the full amount of $17,083.33.[5]

25        94.    Dr. Bradski is entitled to additional penalties under Labor Code § 203 for the

26  § 221 violations. Defendant confiscated as an unlawful penalty the vested stock options or their

27  _____

[4] See ¶131, *below*.

28  [5] See ¶131, *below*.

Computerlaw Group LLP
www.computerlaw.com℠

1 fair market value of $12.24 million, at the time of termination and has failed to issue the stock or

2 pay the fair market value ever since. Under Labor Code § 203, Dr. Bradski is entitled to an

3 additional penalty at the rate of $527.77 per day, multiplied by 30 days in the full amount of

4 $15,833.33.[6]

### Sixth Claim for Relief

#### Conversion

7     95.    Plaintiffs Gary Bradski and Adrian Kaehler incorporate by reference each and

8 every allegation set forth in paragraphs 1–94, as if set forth at length here.

9     96.    Under the Magic Leap Plan, Dr. Kaehler had the vested option to purchase at least

10 96,019 shares of Magic Leap common stock on the date of his termination. Dr. Kaehler

11 performed all conditions and acts necessary to exercise his option rights, including tendering a

12 check to Magic Leap for the full amount of the exercise price.

13     97.    To prevent Dr. Kaehler from exercising that option, Magic Leap has wrongfully

14 transferred those 96,019 (at least) vested options to itself, and noted on its books that Dr. Kaehler

15 is no longer the lawful owner of those vested option rights and refused to note on its books that

16 Dr. Kaehler is the lawful owner of those shares.

17     98.    Magic Leap has wrongfully refused to issue the shares to Dr. Kaehler or to pay

18 Dr. Kaehler anything for the shares that it has converted.

19     99.    Dr. Kaehler has been damaged by Magic Leap's conversion, in the amount of not

20 less than $2.35 million, plus interest from the date of conversion.

21     100.    Under the Magic Leap Plan, Dr. Bradski had the vested option to purchase at least

22 484,941 shares of Magic Leap common stock on the date of his termination. Dr. Bradski

23 performed all conditions and acts necessary to exercise his option rights, including tendering a

24 check to Magic Leap for the full amount of the exercise price.

25     101.    To prevent Dr. Bradski from exercising that option, Magic Leap has wrongfully

26 transferred those 484,941 (at least) vested options to itself, and noted on its books that Dr.

27

28 [6] *See* ¶131, *below*.

1  Bradski is no longer the lawful owner of those vested option rights and refused to note on its

2  books that Dr. Bradski is the lawful owner of those shares.

3      102.   Magic Leap has wrongfully refused to issue the shares to Dr. Bradski or to pay Dr.

4  Kaehler anything for the shares that it has converted.

5      103.   Dr. Bradski has been damaged by Magic Leap's conversion, in the amount of not

6  less than $12.24 million, plus interest from the date of conversion.

7                    SEVENTH CLAIM FOR RELIEF

8                        **Breach of Contract**

9      104.   Plaintiffs Gary Bradski and Adrian Kaehler incorporate by reference each and

10  every allegation set forth in paragraphs 1–103, as if set forth at length here.

11     105.   Dr. Kaehler and Dr. Bradski each had a binding agreement with Magic Leap, the

12  Magic Leap 2012 Stock Option Plan, under which Magic Leap agreed to allow each of Dr.

13  Kaehler and Dr. Bradski to earn incentive compensation in the form of stock options. The Stock

14  Option Plan was a binding agreement for each of Dr. Kaehler and Dr. Bradski to have the right to

15  purchase shares of Magic Leap common stock.

16     106.   As of the date of his termination, Dr. Kaehler had the right to purchase no fewer

17  than 105,100 options, and Dr. Kaehler performed all conditions precedent under the Stock

18  Option Plan, including tender of a check in the proper amount. Any conditions or acts not

19  performed by Dr. Kaehler were excused.

20     107.   As of the date of his termination, Dr. Bradski had the right to purchase no fewer

21  than 466,191 options, and Dr. Bradski performed all conditions precedent under the Stock Option

22  Plan, including tender of a check in the proper amount. Any conditions or acts not performed by

23  Dr. Bradski were excused.

24     108.   Under the terms of the Stock Option Plan, Magic Leap had an obligation to issue

25  the purchased shares to Dr. Kaehler and Dr. Bradski. It did not. Magic Leap's actions constitute a

26  material brief of the Stock Option Plan.

27     109.   Due to this material breach of the Stock Option Plan, Dr. Kaehler has been

28  damaged in an amount of not less than $2.35 million plus interest. The Kaehler Agreement

Computerlaw Group LLP
www.computerlaw.com℠

1  provides that in the event legal action is taken on the contract, the prevailing party on the

2  contract is entitled to recover reasonable attorney's fees, and Dr. Kaehler is accordingly entitled

3  to recover his reasonable attorney's fees.

4    110.    Due to this material breach of the Stock Option Plan, Dr. Bradski has been

5  damaged in an amount of not less than $12.24 million, plus interest.

6                          **EIGHTH CLAIM FOR RELIEF**

7                        **Breach of Employment Agreement**

8    111.    Plaintiffs Gary Bradski and Adrian Kaehler incorporate by reference each and

9  every allegation set forth in paragraphs 1–110, as if set forth at length here.

10    112.    The Kaehler Agreement was a valid and binding agreement of employment

11  between Dr. Kaehler and Magic Leap, and has an implied covenant of good faith and fair dealing

12  imposed into all California contracts by law.

13    113.    The Bradski Agreement was a valid and binding agreement of employment

14  between Dr. Bradski and Magic Leap, and has an implied covenant of good faith and fair dealing

15  imposed into all California contracts by law.

16    114.    As alleged above in ¶¶6–30, Defendant, and each of them breached the Stock

17  Option Plan and its covenant of good faith and fair dealing by making false statements and

18  promises it had no intention of performing or reasonable belief it intended to perform, in

19  connection with:

20          (a)    entering Employment Agreements that included a Contracting Provision

21                 and protections of California law that Defendant had no intention of

22                 following or performing;

23          (b)    persuading each Plaintiff to accept employment and to forbear from

24                 accepting or pursuing other employment or projects;

25          (c)    offering and awarding each Plaintiff incentive compensation for

26                 employment in the form of company stock options that Defendant had no

27                 intention of permitting Plaintiffs, or either of them, to exercise, but rather

28                 that Defendant had every intention of claiming Plaintiffs were being

Computerlaw Group LLP
www.computerlaw.com℠

1  discharged "for cause" and confiscating all vested and unvested shares as a

2  penalty;

3  (d)  persuading each Plaintiff to accept incentive compensation for

4  employment in the form of stock options and to forbear from demanding

5  the value of that incentive compensation in ready money; and

6  (e)  persuading each Plaintiff to forbear from tendering his immediate

7  resignation and to negotiate post-employment transition agreements, that

8  Defendant had every intention using to claim Plaintiffs were being

9  discharged "for cause" and claiming all vested and unvested shares as a

10  penalty.

11  115.  Due to this material breach of the Stock Option Plan, Dr. Kaehler has been

12  damaged in an amount of not less than $2.35 million plus interest.  The Kaehler Agreement

13  provides that in the event legal action is taken on the contract, the prevailing party on the

14  contract is entitled to recover reasonable attorney's fees, and Dr. Kaehler is accordingly entitled

15  to recover his reasonable attorney's fees.

16  116.  Due to this material breach of the Stock Option Plan, Dr. Bradski has been

17  damaged in an amount of not less than $12.24 million, plus interest.

18  ### NINTH CLAIM FOR RELIEF

19  ### Fraud

20  117.  Plaintiffs Gary Bradski and Adrian Kaehler incorporate by reference each and

21  every allegation set forth in paragraphs 1–116, as if set forth at length here.

22  118.  As alleged above in ¶¶6–30, Defendant made false representation, concealments,

23  and/or nondisclosures to each Plaintiff ("Misrepresentations"), with knowledge of falsity, in

24  connection with:

25  (a)  offering each Plaintiff employment that included a Contracting Provision

26  and protections of California law that Defendant knew or should have

27  known that Defendant, or either of them, would fail and refuse to follow

28  or perform;

Computerlaw Group LLP
www.computerlaw.com℠

Computerlaw Group LLP
www.computerlaw.com℠

(b)     persuading each Plaintiff to accept employment on those terms, and to forbear from accepting or pursuing other employment or projects;

(c)     offering each Plaintiff incentive compensation for employment in the form of company stock options that Defendant had no reasonable grounds for believing that Defendant, or either of them, would honor, rather than confiscate as a penalty

(d)     persuading each Plaintiff to accept that incentive compensation for employment in the form of company stock options and to forbear from demanding the value of that incentive compensation in ready money; and

(e)     persuading each Plaintiff to forbear from tendering his immediate resignation and to negotiate post-employment transition agreements, when Defendant had no reasonable grounds for believing that Defendant, or either of them would retaliate with spurious allegations of misconduct and termination "for cause," and declare all Plaintiffs' vested and unvested stock options forfeited.

119.    Defendant made these Misrepresentations with intent to induce reliance by Plaintiffs, and each of them.

120.    Plaintiffs, and each of them, justifiably relied upon the Misrepresentations of Defendant and as a result were harmed in an amount to be proved at trial.

121.    Defendant caused harm to Dr. Bradski through its intentional malice, trickery, and deceit. Its acts and those of its agents, and each of them, were reprehensible and willful, malicious, oppressive, and fraudulent, warranting an award of punitive damages up to ten times the compensatory award, or otherwise as allowed by law, to punish and deter such conduct in the future. U.S. Const. amend. XIV, § 1; Cal. Const., art. I, § 7(a), Cal. Civ. Code § 3294 (2015).

### NINTH CLAIM FOR RELIEF

### Negligent Misrepresentation

122.    Plaintiffs Gary Bradski and Adrian Kaehler incorporate by reference each and every allegation set forth in paragraphs 1–121, as if set forth at length here.

123.   As alleged above in ¶¶6–30, Defendant made false representation, concealments, and/or nondisclosures to each Plaintiff ("Misrepresentations"), without reasonable grounds for believing the assertions to be true, in connection with:

      (a)   offering each Plaintiff employment that included a Contracting Provision and protections of California law that Defendant had no reasonable grounds for believing Defendant, or either of them, would follow or perform;

      (b)   persuading each Plaintiff to accept employment on those terms, and to forbear from accepting or pursuing other employment or projects;

      (c)   offering each Plaintiff incentive compensation for employment in the form of company stock options that Defendant had no reasonable grounds for believing that Defendant, or either of them, would honor, rather than confiscate as a penalty;

      (d)   persuading each Plaintiff to accept that incentive compensation for employment in the form of company stock options and to forbear from demanding the value of that incentive compensation in ready money; and

      (e)   persuading each Plaintiff to forbear from tendering his immediate resignation and to negotiate post-employment transition agreements, when Defendant had no reasonable grounds for believing that Defendant, or either of them would retaliate with spurious allegations of misconduct and termination "for cause," and declare all Plaintiffs' vested and unvested stock options forfeited.

124.   Defendant made these Misrepresentations with intent to induce reliance by Plaintiffs, and each of them.

125.   Plaintiffs, and each of them, justifiably relied upon the Misrepresentations of Defendant and as a result were harmed in an amount to be proved at trial.

126.   Defendant caused harm to Dr. Bradski through its recklessness and malice. Its acts and those of its agents, and each of them, were reprehensible and willful, malicious, oppressive,

Computerlaw Group LLP
www.computerlaw.com℠

1   and fraudulent, warranting an award of punitive damages up to ten times the compensatory

2   award, or otherwise as allowed by law, to punish and deter such conduct in the future. U.S.

3   Const. amend. XIV, § 1; Cal. Const., art. I, § 7(a), Cal. Civ. Code § 3294 (2015).

4   **ELEVENTH CLAIM FOR RELIEF**

5   **Unfair Competition: Unlawful, Unfair, or Fraudulent Acts or Practices**

6   127.    Plaintiffs Gary Bradski and Adrian Kaehler incorporate by reference each and

7   every allegation set forth in paragraphs 1–126, as if set forth at length here

8   128.    Section 17200 of the California Business & Professions Code provides that: "As

9   used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent

10  business act or practice and unfair, deceptive, untrue or misleading advertising and any act

11  prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the

12  Business and Professions Code."

13  129.    As alleged above, Defendant Magic Leap engaged in acts and in practices

14  constituting in "unfair," "fraudulent," and/or "unlawful" business practices in violation of the

15  policy, spirit, and letter of each of California Labor Code § 221, § 2870, and/or §§ 200–203

16  and/or California Business & Professions Code § 16600. This conduct is unlawful *per se* and

17  therefore also violates Business & Professions Code § 17200. Plaintiffs are entitled to remedies

18  and penalties available in this unfair competition action that are cumulative to remedies and

19  penalties under those other state laws. Cal. Bus. & Prof. Code § 17205.

20  130.    As further alleged above, Defendant engaged in unfair, fraudulent, and unlawful

21  business practices in violation of the Contractor Provisions in the Bradski Agreement and/or

22  Kaehler Agreement.

23  131.    As further alleged above, Defendant in unfair, fraudulent, and unlawful business

24  practices with regards to their Stock Option Plan. The plan is designed to permit Defendant to

25  confiscate vested and unvested stock options of its employees as "unlawful penalties," while

26  calculating that the Company's maximum exposure for such unlawful conduct is a month pay to

27  per employee, such that, for example, it has forced Dr. Bradski to forfeit $12.24 million in vested

28  stock options alone at a perceived cost to the Company of less than 15% of that value for each

Computerlaw Group LLP
www.computerlaw.com℠

1   violation. Likewise, it has forced Dr. Kaehler to forfeit $2.35 million in vested stock options

2   alone at a perceived cost to the Company of less than 10% of that value for each violation.

3       132.    Defendant further engaged in unfair, fraudulent, and unlawful business practices

4   in violation of California Business & Professions Code § 17200 in requiring its California

5   employees, including each Plaintiff, to sign employment agreements with (a) noncompetition; (b)

6   non-solicitation; and/or (c) intellectual property assignment terms that violate California law,

7   and/or by engaging in a pattern and practice of attempting to enforce against its California

8   employees such (a) noncompetition; (b) non-solicitation; and/or (c) intellectual property

9   assignment terms in a manner prohibited by or void under California law.

10       133.    Each and both Plaintiffs have suffered injury in fact, and have each and both lost

11   money and property as a result of the violations alleged above. Plaintiffs, and each of them,

12   therefore, are entitled to disgorgement of money or property and/or proceeds from such money or

13   property wrongfully obtained by means of such unfair competition, and/or proceeds from

14   property, Cal. Bus. & Prof. Code §§ 17203, and such other specific or preventive relief may be

15   granted to enforce a penalty, forfeiture, or penal law against Defendant for its acts and practices

16   constituting unfair competition. Cal. Bus. & Prof. Code § 17202.

17       134.    Plaintiffs seek further such orders or judgments as may be appropriate to prevent

18   the use or employment by Defendant of its practices constituting unfair competition, including an

19   accounting and the appointment of a receiver to restore to each Plaintiff and similarly situated

20   persons his or her interest in any money or property, real or personal, which may have been

21   acquired by Defendant by means of such unfair competition. Cal. Bus. & Prof. Code § 17204.

22       135.    Defendant further injured, whether by intent and design or not, Plaintiffs' ability

23   to found and fund a prospective business in perception robotics, and/or to be gainfully employed

24   in their fields. Defendant's actions and practices significantly threatens or harms competition in

25   California and in this District. Unless restrained by this Court Defendant will continue to engage

26   in the unfair, fraudulent, and unlawful acts and practices, as alleged above. Accordingly,

27   Plaintiffs are entitled temporary, preliminary, and permanent injunctive relief against Defendant,

28

**Computerlaw Group LLP**
www.computerlaw.com℠

1   Cal. Bus. & Prof. Code § 17535, enjoining the acts and/or practices and future such acts and/or

2   practices of unfair competition.

3       136.    Defendant's conduct was intentional and willful, each act and the course of

4   conduct constituting deceptive and sharp business practices, in a manner calculated to mislead

5   and cause harm to each Plaintiff, and to the persons similarly situated to Plaintiffs. Defendant

6   knew that its acts and those of its agents, and each of them, were wrongful, reckless, destructive,

7   and constituted in violations of California law and public policy and breaches of its Employment

8   Agreements and the covenant of good faith and fair dealing it had with each Plaintiff. It further

9   knew that its actions would cause harm Plaintiffs at a time when the targets of its conduct were

10  financially vulnerable to their employer's wrongful conduct, exacerbating the economic and

11  other harm. Defendant caused harm to Plaintiffs through its intentional malice, trickery, and

12  deceit. Its acts and those of its agents, and each of them, were reprehensible and willful,

13  malicious, oppressive, and fraudulent, warranting an award of punitive damages up to ten times

14  the compensatory award, or otherwise as allowed by law, to punish and deter such conduct in the

15  future. U.S. Const. amend. XIV, § 1; Cal. Const., art. I, § 7(a), Cal. Civ. Code § 3294 (2015).

16                          **TWELFTH CLAIM FOR RELIEF**

17                              **Declaratory Relief**

18      137.    Plaintiffs Gary Bradski and Adrian Kaehler incorporate by reference each and

19  every allegation set forth in paragraphs 1–136, as if set forth at length here.

20      138.    Each of Dr. Kaehler and Dr. Bradski's Employment Agreements contain non-

21  competition clauses which are, as a matter of law, contracts in restraint of trade, business, or

22  lawful profession. California Business & Professions Code § 16600 renders void "every contract

23  by which anyone is restrained from engaging in a lawful profession, trade, or business of any

24  kind is to that extent void," "except as provided in this chapter." Plaintiffs assert and request that

25  this Court declare that the non-competition clauses in their Employment Agreements do not

26  qualify for any of the exceptions provided by the statute and are therefore void and

27  unenforceable under California law.

28

Computerlaw Group LLP
www.computerlaw.com℠

139. Each of Dr. Kaehler and Dr. Bradski's Employment Agreements contain non-solicitation clauses which are, as a matter of law, contracts in restraint of trade, business, or lawful profession. California Business & Professions Code § 16600 renders void "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void," "except as provided in this chapter." Plaintiffs assert and request that this Court declare that the non-solicitation clauses in their Employment Agreements do not qualify for any of the exceptions provided by the statute and are therefore void and unenforceable under California law.

140. Plaintiffs each seek a further declaration by the Court that: (a) Dr. Kaehler did not violate any non-solicitation term in his Employment Agreement; (b) Dr. Bradski did not violate any non-solicitation term in his Employment Agreement; (c) Dr. Kaehler did not violate any non-competition term in his Employment Agreement; (d) Dr. Bradski did not violate any non-competition term in his Employment Agreement; (e) Dr. Kaehler did not violate any non-disclosure or non-use term in his Employment Agreement; and (f) Dr. Bradski did not violate any non-disclosure or non-use term in his Employment Agreement.

141. Plaintiffs each seek a further declaration by the Court that:

      (a)    That Dr. Kaehler did not engage in any activities that conflicted with his obligations to the Company;

      (b)    That Dr. Bradski did not engage in any activities that conflicted with his obligations to the Company;

      (c)    That Dr. Kaehler's conduct and actions were permitted by his express contractual provision that "that you will be free to pursue ongoing consulting work consistent with your past practice;"

      (d)    That Dr. Kaehler's conduct and actions were permitted by his express contractual provision that "that you will be free to pursue ongoing consulting work consistent with your past practice;"

      (e)    That Dr. Kaehler's ideas and preparations for his independent perception robotics project did and do not relate to Magic Leap's business, or actual

Computerlaw Group LLP
www.computerlaw.com℠

1    or demonstrably anticipated research or development; that does not result

2    from any work performed by Dr. Kaehler;

3    (f)    That Dr. Bradski's ideas and preparations for his independent perception

4    robotics project did and do not relate to Magic Leap's business, or actual

5    or demonstrably anticipated research or development; that does not result

6    from any work performed by Dr. Bradski;

7    (g)    That Dr. Kaehler's ideas and preparations for his independent perception

8    robotics project were developed entirely on his own time without using the

9    Magic Leap's equipment, supplies, facilities, or trade secret information;

10   (h)    That Dr. Bradski's ideas and preparations for his independent perception

11   robotics project were developed entirely on his own time without using the

12   Magic Leap's equipment, supplies, facilities, or trade secret information;

13   (i)    That Dr. Kaehler's ideas and preparations for his independent perception

14   robotics project did not result from any work performed by Dr. Kaehler as

15   employee for Magic Leap;

16   (j)    That Dr. Bradski's ideas and preparations for his independent perception

17   robotics project did not result from any work performed by Dr. Bradski as

18   employee for Magic Leap;

19   (k)    That any "trade secrets" or "confidential information" to which Dr.

20   Kaehler might have been exposed or developed while at Magic Leap are

21   stale as a result of months of effectively uncompensated "garden leave"

22   without access to any Magic Leap information, facilities, equipment, or

23   resources;

24   (l)    That any "trade secrets" or "confidential information" to which Dr.

25   Bradski might have been exposed or developed while at Magic Leap are

26   stale as a result of months of effectively uncompensated "garden leave"

27   without access to any Magic Leap information, facilities, equipment, or

28   resources;

Computerlaw Group LLP
www.computerlaw.com℠

Computerlaw Group LLP
www.computerlaw.com™

1  (m) That Defendant terminated Dr. Kaehler without cause;

2  (n) That Defendant terminated Dr. Bradski without cause;

3  (o) Defendant is barred by California Labor Code §§ 201–203, 221 from

4    demanding that Dr. Kaehler forfeit any of his earnings;

5  (p) Defendant is barred by California Labor Code §§ 201–203, 221 from

6    demanding that Dr. Bradski forfeit any of his earnings;

7  (q) Defendant is barred by California Labor Code §§ 201–203, 221 from

8    demanding that Dr. Bradski forfeit any of his earnings;

9  (r) That any terms, writings, or agreements by Defendant purporting to

10    require Dr. Kaehler to forfeit of his vested stock rights are unenforceable

11    and void as, in effect, a penalty prohibited by California Labor Code

12    § 221; and

13  (s) That any terms, writings, or agreements by Defendant purporting to

14    require Dr. Bradski to forfeit of his vested stock rights are unenforceable

15    and void as, in effect, a penalty prohibited by California Labor Code

16    § 221.

17

### THIRTEENTH CLAIM FOR RELIEF

18

### Unjust Enrichment

19  142. Plaintiffs Gary Bradski and Adrian Kaehler incorporate by reference each and

20 every allegation set forth in paragraphs 1–141, as if set forth at length here.

21  143. As alleged above, Defendant received the benefit of Dr. Kaehler's services as an

22 employee, in return for the promise of company stock and stock options as incentive

23 compensation. Dr. Kaehler performed all his duties and responsibilities, and fulfilled all

24 obligations as an employee in the expectation that he would earn the compensation promised

25 him, including the company stock and company stock options. As alleged, Defendant unjustly

26 retained that benefit at the expense of Dr. Kaehler, when it (a) failed and refused to pay Dr.

27 Kaehler the fair value of those services he performed as employee; (b) failed and refused to issue

28

the shares of the stock options he exercised; and (c) claimed and confiscated for itself all vested and unvested options as a penalty.

144.    As alleged above, Defendant received the benefit of Dr. Bradski's services as an employee under the Bradski Agreement, in return for the promise of company stock and stock options as incentive compensation. Dr. Bradski performed all his duties and responsibilities, and fulfilled all obligations as an employee in the expectation that he would earn the compensation promised him, including the company stock and company stock options. He demanded payment from Magic Leap. As alleged, Defendant unjustly retained that benefit at the expense of Dr. Bradski, when it (a) failed and refused to pay Dr. Bradski the fair value of those services he performed as employee; (b) failed and refused to issue the shares of the stock options he exercised; (c) claimed and confiscated for itself all vested and unvested options as a penalty; and (d) failed and refused, and continues to fail and refuse, to pay Dr. Bradski for the reasonable, customary, or promised value of his services.

145.    Magic Leap is liable and Dr. Kaehler and Dr. Bradski each is entitled to damages in an amount according to proof and sufficient prevent unjust enrichment of Defendant, and/or restitution from Magic Leap for the money or property representing the reasonable value of each Plaintiff's respective services provided to Magic Leap, to the promised compensation, to and/or proceeds from such money or property wrongfully obtained by means of such unfair competition, and/or proceeds from property for all costs of removal and remedial and preventive actions at that site.

146.    The Kaehler Agreement provides that in the event legal action is taken on the contract, the prevailing party on the contract is entitled to recover reasonable attorney's fees, and Dr. Kaehler is accordingly entitled to recover his reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, and each of them, pray that this Court enter judgment in favor of each Plaintiff and against Defendant Magic Leap, as follows:

A.    On the First Claim for Wrongful Termination in Violation of Public Policy Codified in California Labor Code § 2870: for compensatory damages, including economic and

1  emotional distress damages according to proof; for punitive damages in an amount sufficient to

2  punish and deter such conduct in the future; for temporary, preliminary, and permanent

3  injunctions enjoining such conduct by Defendant and Magic Leap's agents against California

4  employees in the future;

5        B.    On the Second Claim for Wrongful Termination in Violation of Public Policy

6  Codified in California Business & Professions Code § 16600: for compensatory damages,

7  including economic and emotional distress damages according to proof; for punitive damages in

8  an amount sufficient to punish and deter such conduct in the future; for temporary, preliminary,

9  and permanent injunctions enjoining such conduct by Defendant and Magic Leap's agents

10  against California employees in the future;

11        C.    On the Third Claim for Wrongful Termination in Violation of Public Policy

12  Codified in Labor Code §§ 200–203: for compensatory damages, including economic and

13  emotional distress damages according to proof; for punitive damages in an amount sufficient to

14  punish and deter such conduct in the future; for temporary, preliminary, and permanent

15  injunctions enjoining such conduct by Defendant and Magic Leap's agents against California

16  employees in the future;

17        D.    On the Fourth Claim for Wrongful Termination in Violation of Public Policy

18  Codified in Labor Code § 221: for compensatory damages, including economic and emotional

19  distress damages according to proof; for punitive damages in an amount sufficient to punish and

20  deter such conduct in the future; for temporary, preliminary, and permanent injunctions enjoining

21  such conduct by Defendant and Magic Leap's agents against California employees in the future;

22        E.    On the Fifth Claim for Labor Code Violations: for compensatory damages

23  representing wages and other compensation owed to Dr. Kaehler on the date of his wrongful

24  termination, for interest from the date that compensation was due, for penalties as permitted by

25  Labor Code § 203, and for reasonable attorney's fees as permitted by Labor Code § 218.5; for

26  compensatory damages representing wages and other compensation owed to Dr. Bradski on the

27  date of his wrongful termination, for interest from the date that compensation was due,; for

28

Computerlaw Group LLP
www.computerlaw.com℠

1   penalties as permitted by Labor Code § 203, and for reasonable attorney's fees as permitted by

2   Labor Code § 218.5;

3       F.      On the Sixth Claim for Conversion for an award of compensatory damages in the

4   amount to be proven at trial but not less than **$2.35 million** to Dr. Kaehler, and **$12.24 million** to

5   Dr. Bradski for Magic Leap's conversion of each Plaintiff's shares and vested option rights;

6       G.      On the Seventh Claim for Breach of the Stock Option Plan, for damages to each

7   Plaintiff, in the amount to be proven at trial, for material breach of the Stock Option Plan

8   agreement with each Plaintiff by Magic Leap, and for Dr. Kaehler's reasonable attorney's fees as

9   permitted by contract;

10      H.      On the Eighth Claim for Breach of Employment Agreements for damages to each

11  Plaintiff, in the amount to be proven at trial, for material breach of the Employment Agreement

12  with each Plaintiff by Magic Leap, and for Dr. Kaehler's reasonable attorney's fees as permitted

13  by contract;

14      I.      On the Ninth Claim for Fraud for compensatory damages according to proof to

15  each Plaintiff, and punitive damages to each Plaintiff, in an amount to punish and deter such

16  conduct;

17      J.      On the Tenth Claim for Negligent Misrepresentation for compensatory damages

18  according to proof to each Plaintiff, and punitive damages to each Plaintiff, in an amount to

19  punish and deter such conduct;

20      K.      On the Eleventh Claim for Unfair Competition for temporary, preliminary, and

21  permanent injunctive relief enjoining the acts and practices and future such acts or practices of

22  unfair competition; for an accounting and disgorgement of money or property and/or proceeds

23  from such money or property wrongfully obtained by means of such unfair competition, and/or

24  proceeds from property, for such orders or judgments as may be appropriate to prevent the use or

25  employment by Defendant of its practices constituting unfair competition, including the

26  appointment of a receiver to restore to each Plaintiff and similarly situated persons his or her

27  interest in any money or property, real or personal, which may have been acquired by Defendant

28  by means of such unfair competition; for such other specific or preventive relief may be granted

Computerlaw Group LLP
www.computerlaw.com℠

1   to enforce a penalty, forfeiture, or penal law against Defendant for its acts and practices

2   constituting unfair competition; and for an award of punitive damages up to ten times the

3   compensatory award, or otherwise as allowed by law, to punish and deter such conduct in the

4   future;

5       L.      On the Twelfth Claim for judicial declarations:

6           (a)    That Dr. Kaehler did not engage in any activities that conflicted with his

7                  obligations to the Company;

8           (b)    That Dr. Bradski did not engage in any activities that conflicted with his

9                  obligations to the Company;

10          (c)    That Dr. Kaehler's conduct and actions were permitted by his express

11                 contractual provision that "that you will be free to pursue ongoing

12                 consulting work consistent with your past practice[;]"

13          (d)    That Dr. Kaehler's conduct and actions were permitted by his express

14                 contractual provision that "that you will be free to pursue ongoing

15                 consulting work consistent with your past practice[;]"

16          (e)    That Dr. Kaehler's ideas and preparations for his independent perception

17                 robotics project did and do not relate to Magic Leap's business, or actual

18                 or demonstrably anticipated research or development; that does not result

19                 from any work performed by Dr. Kaehler;

20          (f)    That Dr. Bradski's ideas and preparations for his independent perception

21                 robotics project did and do not relate to Magic Leap's business, or actual

22                 or demonstrably anticipated research or development; that does not result

23                 from any work performed by Dr. Bradski;

24          (g)    That Dr. Kaehler's ideas and preparations for his independent perception

25                 robotics project were developed entirely on his own time without using the

26                 Magic Leap's equipment, supplies, facilities, or trade secret information;

27

28

Computerlaw Group LLP
www.computerlaw.com℠

(h)  That Dr. Bradski's ideas and preparations for his independent perception robotics project were developed entirely on his own time without using the Magic Leap's equipment, supplies, facilities, or trade secret information;

(i)  That Dr. Kaehler's ideas and preparations for his independent perception robotics project did not result from any work performed by Dr. Kaehler as employee for Magic Leap;

(j)  That Dr. Bradski's ideas and preparations for his independent perception robotics project did not result from any work performed by Dr. Bradski as employee for Magic Leap;

(k)  That any "trade secrets" or "confidential information" to which Dr. Kaehler might have been exposed or developed while at Magic Leap are stale as a result of months of effectively uncompensated "garden leave" without access to any Magic Leap information, facilities, equipment, or resources;

(l)  That any "trade secrets" or "confidential information" to which Dr. Bradski might have been exposed or developed while at Magic Leap are stale as a result of months of effectively uncompensated "garden leave" without access to any Magic Leap information, facilities, equipment, or resources;

(m)  The non-solicitation term in Dr. Kaehler's Employment Agreement are barred by and unenforceable under California Business & Professions Code §16600;

(n)  The non-solicitation term in Dr. Bradski's Employment Agreement are barred by and unenforceable under California Business & Professions Code §16600;

(o)  The non-competition terms in Dr. Kaehler's Employment Agreement are barred by and unenforceable under California Business & Professions Code §16600;

Computerlaw Group LLP
www.computerlaw.com℠

Computerlaw Group LLP
www.computerlaw.com℠

1     (p)     The non-competition terms in Dr. Bradski's Employment Agreement are

2               barred by and unenforceable under California Business & Professions

3               Code §16600;

4     (q)     That Dr. Kaehler did not violate any non-solicitation term in his

5               Employment Agreement;

6     (r)     That Dr. Bradski did not violate any non-solicitation term in his

7               Employment Agreement;

8     (s)     That Dr. Kaehler did not violate any non-competition term in his

9               Employment Agreement;

10    (t)     That Dr. Bradski did not violate any non-competition term in his

11              Employment Agreement;

12    (u)     That Dr. Kaehler did not violate any non-disclosure or non-use term in his

13              Employment Agreement;

14    (v)     That Dr. Bradski did not violate any non-disclosure or non-use term in his

15              Employment Agreement;

16    (w)    That Defendant terminated Dr. Kaehler without cause;

17    (x)     That Defendant terminated Dr. Bradski without cause;

18    (y)     Defendant is barred by California Labor Code §§ 201–203, 221 from

19              demanding that Dr. Kaehler forfeit any of his earnings;

20    (z)     Defendant is barred by California Labor Code §§ 201–203, 221 from

21              demanding that Dr. Bradski forfeit any of his earnings;

22    (aa)    Defendant is barred by California Labor Code §§ 201–203, 221 from

23              demanding that Dr. Bradski forfeit any of his earnings;

24    (bb)    That any terms, writings, or agreements by Defendant purporting to

25              require Dr. Kaehler to forfeit of his vested stock rights are unenforceable

26              and void as, in effect, a penalty prohibited by California Labor Code

27              § 221; and

28

1    (cc)    That any terms, writings, or agreements by Defendant purporting to

2            require Dr. Bradski to forfeit of his vested stock rights are unenforceable

3            and void as, in effect, a penalty prohibited by California Labor Code

4            § 221.

5    147.    On the Thirteenth Claim for Unjust Enrichment, for damages in an amount

6    according to proof and sufficient prevent unjust enrichment of Defendant, and/or restitution from

7    Magic Leap for the money or property representing the reasonable value of each Plaintiff's

8    respective services provided to Magic Leap, to the promised compensation, to and/or proceeds

9    from such money or property wrongfully obtained by means of such unfair competition, and/or

10   proceeds from property for all costs of removal and remedial and preventive actions at that site,

11   and for Dr. Kaehler's reasonable attorney's fees as permitted by contract.

12   M.      On all causes of action, for costs of suit and for attorneys' fees as permitted by

13   law or agreement; for pre- and post-judgment interest; and for such other and further relief as the

14   Court may deem just and proper.

15   Dated: September 12, 2016                    COMPUTERLAW GROUP LLP

16

17                               By:    _____/s/ Jack Russo_____
                                        Jack Russo
18                                      Christopher Sargent

19                                      Attorneys for Plaintiffs
                                        GARY BRADSKI AND ADRIAN KAEHLER
20

21

22

23

24

25

26

27

28

Computerlaw Group LLP
www.computerlaw.com℠

1

**JURY TRIAL DEMAND**

2        Plaintiffs Dr. Kaehler and Dr. Bradski, and each of them, demand a jury trial on all claims

3  and issues so triable.

4  Dated: September 12, 2016             COMPUTERLAW GROUP LLP

5

6                      By:       */s/ Jack Russo*

7                            Jack Russo
Christopher Sargent

8                            Attorneys for Plaintiffs
GARY BRADSKI AND ADRIAN KAEHLER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Computerlaw Group LLP**
www.computerlaw.com℠